Pecic, J.,
delivered the opinion of the court:
This claimant states that on the 16th day of November, 1863, he entered into a contract with Captain Charles W. Thomas, assistant quartermaster of the United States army at Baltimore, by which it was agreed that Gibbons should deliver, for the use of the United States, one hundred thousand bushels of oats at Baltimore within thirty days, at the price of ninety-eight cents per bushel, to be of the weight of thirty-two pounds, and a like quantity at Fort Monroe, of the same quality, for the price of one dollar and three-fourths of a cent per bushel. The oats were to be delivered in sacks of two bushels each, or thereabouts, and to be dry and of the best merchantable quality. The oats were to be subject to the inspection of government agents, and to be delivered within thirty days. They were shipped on vessels to Fortress Monroe for delivery under the contract; but the government being unprepared to receive them, the vessels were detained, by reason of which claimant was forced to pay by way of demurrage $333 35. That, in further fulfilment of his contract, large quantities of oats were offered at Baltimore which were not accepted because of want of storage and transportation, wherefore claimant was obliged to have the oats rebauled to his warehouse and re-stored, which caused him expense amounting to the sum of four hundred dollars. That he was ready at all times during the continuance of the contract to fulfil on his part; but that the government refused to receive, when offered, all but a part of the oats, and at the expiration of the contract the claimant notified the quartermaster that his obligations under the contract were at an end. Notwithstanding this, the quartermaster required the claimant, after the expiration of the contract, to furnish other oats to the extent of 140,742 bushels, at the price fixed in the contract, oats having in the mean time advanced in price, while other parties were receiving ten and twelve cents more per bushel from the agents of the United States; for which he claims the sum of $14,047 26.
The claimant also avers that he was compelled to receive for his oats certificates of indebtedness instead of money, whereby he lost $1,646 88.
That he purchased of the United States five thousand second-hand bags, for which he was to pay the market price, but that he was *426 charged for the bags in bis settlement with the government two cents per bushel more than the market rates, making the sum of $330. In addition to this sum, the government withheld the sum of §1,446 52, on the pretence that the government had been compelled to pay that sum over and above the price named in the contract for oats purchased to make up what claimant had failed to supply under it. That he was forced by his necessities to submit to these exactions in his settlement with the government agent, but did so under protest. Claimant insists that there is due to him from the United States by reason of the premises the sum of §19,006 71.
There is abundant proof in the record to show that the claimant attempted to carry out the contract in good faith, but that he was prevented by the agents of the government. Several witnesses testify to the fact that oats were offered at various times under the contract which were refused. There is proof that some of the oats offered were not good; but it is also shown that oats which wore rejected because of quality were afterwards approved and accepted, and that claimant was prepared to execute the contract. Charles L. Branch, who says he was clerk in charge of the forage and fuel desk in the office of the quartermaster in Baltimore, testifies that previous to the expiration of Mr. Gibbons’s contract, the demand for oats ceased, and our warehouses were filled. “ The terms of the contract required the delivery of 100,000 bushels of oats within thirty days at Baltimore, Maryland. Owing to the facts above stated, and that it was not deemed expedient that the government furnish temporary storage, the oats could, not be received. I gave Mr. Gibbons instructions for the delivery of oats under-his contract by order of Captain Newport, and delivery was made until the warehouses were filled, as well as the railroad platform capacity at Camden station in use of quartermaster’s department, when I declined to receive any more, and Mr. Gibbons was •so notified. I always found Mr. Gibbons prepared to deliver oats under the contract when they could be received.” Again he says : “ The quartermaster’s department refused to receive oats from the claimant as soon as their warehouses were full; but I don’t remember whether the time of the contract was half completed, or at what time it was. This was the only reason assigned for such refusal.” ‘‘ I was superintendent and inspector to receive the oats.” “ John C. Magruder was in charge of the government warehouse at Camden station, which was full when the oats from Mr. Gibbons were refused.” Magruder says : “ My orders came to me from the assistant quartermaster, through the ehief clerk, Mr. Branch,” (the above-named witness.) “ During Mr. *427 Gibbons’s contract we sometimes declined to receive oats from bim because we could not procure transportation for them.” William H. Stier, a witness for claimant, says he was in November and December, 1863, engaged in Baltimore as hay and grain inspector for the United States. He knew that Mr. Gibbons had a contract to deliver oats in the fall of 1863, “and that frequently during the delivery-by him of oats, his drays were sent back because we had no place for storing them, and they were frequently returned to him on account of the movements of the army.” This testimony clearly shows that the government rejected oats for its own convenience, and that the claimant was not in fault for non-delivery. The refusal of the government to receive merchantable oats within the life of the contract, when offered, as these oats were, at different times and in such quantities that they might have been disposed of conveniently if there had been any disposition to do so, will excuse the claimant from any obligation under the contract on his part. The obligation to receive the oats when they were offered was as strong as the obligation to deliver; the claimant was ready, but he could not perform because the government would not permit him ; he was not bound under continuing obligation, and any reasonable offer and improper refusal put an end to the contract.
After the expiration of the contract, the government warehouses becoming empty and the demand for oats increasing, the quartermaster at Baltimore sent an orderly” to claimant requesting his immediate presence with the messenger or “ orderly” at the office of that- official, which was understood by the claimant to be an arrest. About the same time the following letter was received by claimant: “ Tour attention is respectfully called to the letter of Captain C. W. Thomas, assistant quartermaster, of 30th December, 1863, requesting the immediate delivery of the balance of your contract for oats, under penalty of a purchase in open market, the difference of cost to be charged to you. You are now requested to complete your contract and make the delivery within eight (8) days. Unless this is done, I shall purchase in open market charging the difference of cost to you, in accordance with the letter of Captain Thomas.
“ Respectfully,
“ R. M. NEWPORT,
“ Captain and, Assistant Quartermaster.”
The letter of Captain Thomas referred to is not in the record.
The claimant, influenced by the above assumption of power and the threats used, undertook, though not without remonstrating against the injustice of the act, to deliver the oats which the officers had previously *428 declined to receive, in execution of the contract. Bj tbis time oats bad advanced in price, and be now seeks to recover tlie difference between what the oats cost which he had ready for delivery before the 16th of December arid the price which he was compelled to pay after that date, in order to complete the delivery, which he says was exacted from him. This he cannot do. The officers who threatened had no authority to compel him to deliver the oats. He was released from his obligation by the conduct of the government, and the threats used were superserviceable and improper. If he was so unwise as to submit to the unauthorized menaces of the quartermaster, he must take the consequences. It is not to be presumed that the government ever authorized its agents to resort to illegal means to accomplish any purpose whatever.
If the government refused to receive the oats under the contract, when they were offered in proper time, it will not be permitted to compel a delivery of them after its right to demand them had ceased; and this the claimant should have known. Hence he cannot recover the difference in price between that named in the contract and that ruling in market after its expiration for the oats subsequently delivered under the assumed compulsory power of the quartermaster. Nor can the government withhold from the sum justly due to the claimant any difference which was paid for oats purchased after the expiration of the contract exceeding the price fixed by it. Therefore the claimant should recover the sum of $1,063 17, which was so withheld at the time of the settlement.
The claimant purchased of the quartermaster a number of grain sacks, for which he was to pay six cents per bushel, but the quartermaster deducted for these eight cents per bushel, which was withheld from the sum due to claimant making him pay for the sacks $330, more than the price for which they were sold to him. This was an improper deduction, and the claimant is entitled to a judgment for that sum.
The claim for demurrage is sustained as to two of the vessels only, viz: the Townsend and Martin, and for this account the claimant should recover $333 35.
We would make compensation to the claimant for the vexation and expense he suffered in hauling and offering to deliver oats under his contract which were not received, but the proof in that regard is not so explicit as to time and quantities as to enable us to fix upon any satisfactory amount for his damages. The uncertainty of the proof prevents a judgment for the injury the claimant suffered in this respect.
*429 The claim for discount suffered upon the certificates of indebtedness is not recognized. The claimant accepted the certificates in payment, and he cannot now repudiate his own action and be compensated for doing so.
Judgment will be rendered for claimant for one. thousand seven hundred and twenty-six dollars and fifty-two cents, ($1,726 52.)
Loring, J., dissented.