Ex parte A. C. MARSHALL.

Opinion filed January 19, 1918.

HABEAS CORPUS—LICENSE TAX ON AUTOMO-
BILES WHILE IN SERVICE OF MILITARY
ORGANIZATIONS OF UNITED STATES.

Where a partnership composed of individuals residing in the City of Jacksonville are engaged in, and presumably licensed to do, a general business of running auto busses and other

motor driven vehicles for hire over the streets and public highways in and around said city, who, as an incident of their general business of Petro-Motor-Carriers, enter into a side contract with the commanding officer of a military encampment of United States soldiers located within a few miles of said city, by which they acquire a monopoly of conveying such military officers and soldiers back and forth between such city and such encampment at a reduced fare paid by each individial soldier carried, and by which they agree to observe such rules and regulations in the operation of such vehicles as are prescribed in such contract, under penalty only of forfeiture of such contract for non-compliance therewith. Such motor vehicles, or their operation not being under military control and the United States not having any interest or ownership therein or control thereover. Petro-Motor-Carriers for hire, and HELD, further that such not the grant of such a franchise as will exempt such partnership from the payment of the license tax imposed by the State, county or municipality for conducting the business of Petro-Motor-Carriers for hire, and HELD. further that such partnership was not exempt from, but was liable for the payment of such license.

Original.

Writ denied.

*Kay, Adams & Ragland,* for Petitioner.

TAYLOR, J.—The petitioner, A. C. Marshall, by his petition for the writ of *habeas corpus* filed here seeks relief from arrest by the Chief of Police of the City of Jacksonville under a warrant based on an affidavit charging him with operating an auto bus with a seating capacity of twelve persons on a public street of said city without having paid the license tax of fifty dollars required by ordinance No. C-4 of said city, approved August 13th, 1917.

The petition alleges that on November 21st, 1917, your petitioner as Manager of Orange Belt Auto Line, a copartnership composed of himself and K. C. McCullough, obtained from Fred L. Munson, Lieutenant Colonel Q. M. Corps, ·the commanding officer of the Quartermaster Camp located at Camp Johnston, near Jacksonville, Florida, a franchise and permit to maintain a satisfactory auto bus service between said city and said camp, the same being granted in consideration of certain enumerated conditions and regulations therein prescribed by the said commanding officer with reference to the character of equipment, character of service, precautions to be observed, route to be traversed, fares to be charged, etc., all of which will more fully appear by a copy of said franchise hereto attached, marked Exhibit "C" as follows:

"HEADQUARTERS CAMP JOSEPH E. JOHNSTON
JACKSONVILLE, FLA.

No. 004x500                          November 21, 1917.
Mr. A. C. Marshall,
     Manager Orange Belt Auto Line,
               Jacksonville, Fla.

Dear Sir:—

This is to certify that you are authorized to maintain a satisfactory auto bus service between the City of Jacksonville and Camp Joseph E. Johnston, Fla.

That in consideration of this privilege, you have agreed in writing to abide by the following enumerated conditions, viz:

(a)   To run only first class cars driven by competent and reliable chauffeurs.

(b)   That during the construction of the camp you will cause your chauffeurs to drive slowly and carefully through the congested streets of the camp, and that·your

cars will in no way interfere with the working traffic of the Constructing Quartermaster or of his building contractors.

(c)   That you, personally, will be held liable for any injury to persons or animals or to damage caused other vehicles that may become injured or damaged on the camp reservation through the faulty or careless driving of any of your chauffeurs.

(d)   That the termini of the route will be the vicinity of the Mason Hotel, corner Julia and Bay Streets, Jacksonville, Fla., and the Club House at Camp Johnston.

(e)   That the fare will not exceed 40 cents per one way trip nor more than 75 cents per round trip.

(f)   That so long as you abide by all of the above named conditions you will be authorized to continue your bus service for at least six months following the completion of the electric car line from Ortega to the Camp.

(g)   That a noncompliance with any or all of the said conditions may cause a forfeiture of the privilege of operating your bus service within the camp reservation.

Very truly yours,

(Signed)   F. L. Munson,

Lt. Col. Q. M. Corps.

Indorsement.

I have carefully read the above letter and do hereby agree to comply with all its requirements to the best of my ability.

(Signed)   A. C. Marshall,

General Manager, Orange Belt Auto Line."

That on December 24th, 1917, pursuant to said franchise and permit, which was duly accepted by your petitioner as appears by the endorsement thereon the

said commanding officer promulgated General Order No. 33 prescribing further regulations under which said bus service shall be operated by petitioner and enjoyed by the officers and enlisted men of the United States government stationed at said camp, which order is as follows:

"HEADQUARTERS CAMP JOSEPH E. JOHNSTON,
         Jacksonville, Fla., December 24, 1917.

General Orders,
   No. 33.

1. A contract has been entered into between the Commanding Officer and the Orange Belt Auto Line under the management of Mr. A. C. Marshall. All cars operating under the management of this Company are marked 'O. B. A. L. Govt. Controlled.'

2. Under his contract Mr. Marshall guarantees to use only first-class equipment to be driven by competent and experienced chauffeurs. These chauffeurs will hold a certificate of service signed only by Mr. Marshall. The questions of speed and the overloading of cars are fully covered in the contract.

3. Every effort has been made by this office to safeguard the limbs and lives of all men of this command who may enter any car licensed to operate between the Camp and the City of Jacksonville.

4. In view of the above all officers and enlisted men are warned against entering any car after the chauffeur thereof has informed them that there is no further room. The last man or men to enter a car after its authorized seating capacity has been reached are the offenders and must at once leave said car upon being asked to do so by the chauffeur. It shall be the duty of any officer or non-commisisoned officer, who may be either inside or

near the car, to order off and keep off any surplus passengers when appealed to for assistance by the chauffeur.

5. In case a car is overloaded and the offending man will not get off upon request by the chauffeur, said chauffeur has orders to hold his car at a standstill until the offender leaves said car.

6. Any chauffeur who allows his car to be overloaded or who fails to stop at the gate upon being ordered to do so by the gate guard, or fails to obey the letter as well as the spirit of this order, will be excluded from entering this Camp for a period of six (6) months, or his car will be excluded for same period or both.

7. In order that all men of this Camp may enjoy a fairly equal opportunity of getting accommodations in the various authorized busses, on and after the 25th instant, the starting point of one-third of the busses will be from the junction of old brick road and 12th Street, north of Y. M. C. A. No. 2; one-third from junction from brick road and 6th Street; and one-third from Hostess House (old club house).

8. All cars starting from camp from these three points will be plainly marked 12th St., 6th St., and 1st St., respectively. All cars so marked will deliver their passengers as far in the camp as said passengers desire to go, but all 6th and 12th Street cars must arrive at their respective stations on the return trip to Jacksonville empty.

9. The 12th Street bus line is primarily intended for the accommodation of the troops living in blocks H, J, K, and L; 6th Street line for blocks D, E, F and G; and 1st Street line for Headquarters, Hostess House and blocks A, B and C.

10. A strict compliance with the terms of this order

on the part of all concerned will result in better service, contentment and safety.

By order of LIEUT. COLONEL MUNSON.

J. H. SPENGLER,

Captain Q. M., U. S. R.,

Adjutant."

That in addition to the regulations set forth in said original franchise of Nov. 21st, 1917, and in said general order No. 33, the said commanding officer made other requirements and regulations of said bus service rendered by your petitioner, the aforesaid franchise, and the conditions under which the sa¬e were to be enjoyed by petitioner were fully confirmed and authorized by the said commanding officer, a copy of the said confirmation, together with petitioner's acceptance thereof is attached to the petition marked exhibit "E," as follows:

"HEADQUARTERS CAMP JOSEPH E. JOHNSTON, JACKSONVILLE, FLA.

January 5, 1918.

Mr. A. C. Marshall, Manager,

Orange Belt Auto Line,

Jacksonville, Fla.

Dear Sir:—

I have deemed it advisable to confirm the privilege granted to you under date of November 21st, 1917, for the maintenance of a bus service between the City of Jacksonville and Camp Joseph E. Johnston, pursuant to the modifications thereof ordered or authorized by me since the date of same, and to that end, I hereby certify and confirm that you have been authorized by me to have the exclusive right and privilege to maintain a satisfactory auto bus service between said City and said Camp, as long as the service supplied by you over said

route shall be adequate and satisfactory to me as Commanding Officer of said Camp, subject to the following regulations and orders, and such further orders and regulations as may be made or authorized by me. That in consideration of said exclusive right and privilege, you have agreed in writing and will agree by your acceptance hereof, to abide by the following enumerated conditions:

1. To run only first-class cars, driven by competent and reliable chauffeurs.

2. That you, personally, shall be held liable for any injury to officers and enlisted men, or Government property, that may become injured or damaged on said Camp Reservation, or upon any portion of the route hereinafter designated, through the faulty or careless driving of any of the chauffeurs operating cars owned by your auto line; and you shall also be personally liable for like injuries or damage arising under like circumstances, due to the faulty or careless driving of any of the chauffeurs operating all other cars which may come under your control, although owned by other parties, when engaged in said service.

3. That the termini of the route over which said bus service shall be maintained shall be the points at said Camp heretofore designated in General Order No. 33, under date of December 24th, 1917, and the vicinity of the Mason and Aragon Hotels, in the City of Jacksonville, Fla. That between said termini, said route shall traverse the public highways and public streets now existing between said Camp and said termini in said city. Provided, however, that upon special orders or requests from me or my staff officer detailed for that purpose, you may be required to divert cars to or from the Union

Station in said city, when necessary to transport officers or enlisted men to or from said station.

4. That all cars operated by you in said service, whether owned by your auto line or under your control, shall be marked 'O. B. A. L. Govt. Controlled,' and each shall carry a designated number for the purpose of identification.

5. That you will cause all chauffeurs operating each and every of the cars under your management and control in said service to drive slowly and carefully through the congested streets of said Camp Reservation and shall require said chauffeurs to observe all reasonable traffic regulations over the entire route, as hereinbefore designated.

6. That the fares which you are authorized to charge officers and enlisted men, when transported in auto busses, between said Camp and said City, shall be 35 cents each way, and 25 cents each way between the end of the street car line at Ortega, Fla. and said Camp; these rates to apply between the hours of 5:00 A. M. and 12:00 Midnight; between 12:00 Midnight and 5:00 A. M. the rates shall be 50 cents each way. The fares for officers and enlisted men when transported in touring cars between said Camp and said city shall be 50 cents each way, irrespective of the hour. That the fare for civilians between said City and said Camp shall be 50 cents each way, without regard to the hour or equipment. That until the construction of said Camp shall be completed by A. Bentley & Sons Company, you will also be required to transport employes of said contractors for a fare of 35 cents each way, the transportation of such employes, however, to be subordinated to the transportation of the officers and enlisted men stationed in said Camp. That as exceptions to the fares above

provided, you will be required to transport free of charge provost guards detailed by my staff to police said highway and to perform police duty in said city, and in order to facilitate the aforesaid free transportation, you are authorized to issue free passes to said provost guards.

7. That all automobiles and auto busses placed in said service, either owned by your auto line or under your control, shall be devoted primarily to the transportation of officers and men between said Camp and said city, the transportation of civilians to be subordinated to the needs of said officers and men and the cars devoted to said service shall not, during the continuance of your privilege as aforesaid, be diverted to any other service without my consent or authorization.

8. That as to the matter of schedules and details of the service, you will be governed by the orders and directions of Capt. C. Walcott, Q. M. U. S. R., a member of my staff, having in charge the transportation facilities to be rendered by you, and you will also be required to make said service conform to my General Order No. 33, under date of December 24th, 1917, and such further orders as may from time to time be made by me with reference to said service.

9. That the equipment which you will be required to furnish shall be sufficient to meet the average daily demand for transportation between said Camp and sail City, it being recognized that the unusual demands upon holidays or other special occasions cannot be made the test of the adequacy of your equipment.

10. In order to enlarge the equipment of your auto line, you are authorized to make contracts with other parties, providing for the placing of their machines under your exclusive management and control, to be

subject to the regulations hereinbefore mentioned, and as a consideration to you for the time and expense of supervising and for the responsibility assumed by you in regard to injuries or damage to Government men or property, you are authorized to require such other parties to pay you a percentage not exceeding 10 per cent. of the gross receipts received from the operation of their respective cars in said service.

11. In the exercise and enjoyment of the exclusive privilege and right herein granted and confirmed to you, you will recognize that my reasons for granting you the same, among other things, are that I have found it essential to the morale of the officers and men stationed at said Camp to permit them to visit said City on private business and for recreation, also to have said provost guards detailed for police duty in said City, to prevent said men, as far as possible, from participating in various form of dissipation, and have further found it necessary to the morale of said officers and men to permit their relatives and friends to visit them at said Camp, and have found it necessary also for myself and members of my staff to go to and from said City on official business of the U. S. Government, for which purposes it was essential to provide a means of transportation between said Camp and said City for the officers and enlisted men stationed there, as well as for civilians having occasion to visit said Camp, there being no street car line to said Camp and no other adequate means of transportation available; also that I was desirous of having the entire bus service rendered to said Camp under one management, so that the responsibility for injuries or damage to government men or property would be definitely located and assumed by a responsible party; also that the greatest possible safety would

be obtained to the officers, men and Government property affected by said service, and in view of these considerations, you will be expected to carefully observe the foregoing regulations and such others as may be from time to time duly authorized, and so long as you abide thereby, your exclusive privilege and right, as hereinbefore defined, shall continue. That a non-compliance with any or all of said conditions may cause. a forfeiture of said right and privilege.

Yours very truly,

F. L. MUNSON,

Lieutenant Colonel, Q. M. Corps.

Indorsement.

I have carefully read the foregoing communication and do hereby agree to comply with all its requirements to the best of my ability.

A. C. MARSHALL,

General Manager, Orange Belt Auto Line."

That at the time of his arrest the alleged auto bus mentioned in said warrant was being operated in said bus service under the authority and subject to the conditions and regulations of the said franchise of November 21, 1917, as also said subsequent regulations, and also subject to said confirmation of January 5th, 1918, and not otherwise.

That the service rendered by your petitioner with each and every of the auto buses and automobiles employed in said service including the aforesaid bus being operated at the time of his arrest is a service constituting business of the United States government; that the said auto buses and automobiles employed in said service, as aforesaid, are instrumentalities engaged in the transaction of business for the military branch of the United

States government, under the exclusive direction and control of said commanding officer, or such member of his staff as he may detail for that purpose. That under the franchise granted and confirmed to your petitioner as aforesaid, and subject to the rules, regulations and conditions therein prescribed your petitioner in performing a part of said service with the aforesaid auto bus, as well as some forty additional auto buses and automobiles now owned and controlled by your petitioner and engaged in said service, constitutes an agency of the United States government. That the right to operate said bus line over said route and to receive tolls therefrom in accordance with the rules, regulations and conditions provided in the said franchise or confirmation thereof, constituted a franchise of the Federal government, and is not subject to the license tax provided in said ordinance.

Many cases from the Supreme Court of the United States and other Federal and State courts are cited to support the contentions of the petitioner, such as: Osborne v. U. S. Bank, 9 Wheat. (U. S.) 738; California v. Pacific R. Co., 127 U. S. 1, 8 Sup. Ct. Rep. 1073; San Benito County v. Southern Pac. R. Co., 77 Cal. 518, 19 Pac. Rep. 827; City of San Francisco v. Western Union Tel. Co., 96 Cal. 140, 31 Pac. Rep. 10, 17 L. R. A. 301; Western Union Tel. Co., v. Lakin, 53 Wash. 326, 101 Pac. Rep. 1094; Williams v. City of Talladega, 226 U. S. 404, 33 Sup. Ct. Rep. 116; Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 35 Sup. Ct. Rep. 27. We are in accord with the holdings of all of these cases, except possibly some expressions used therein *illustratum arguendo* that may be classed as *obiter dictum;* but unfortunately for the petitioner none of them fit the facts

of the case in hand. In all of them a license tax was sought to be imposed by a State, county or municipality upon the right to do business either by a bank, a railroad coapany or telegraph company that had been chartered, and had been granted its franchise and right to do business, by the Congress of the United States, and in all of them it was held in effect that such license tax was invalid because it was an unwarranted invasion of rights properly granted by the Federal government, and amounted virtually to an attempt to annul such Federal grant. In the case of Choctaw, O. & G. R. Co. v. Harrison, *supra,* the State of Oklahoma undertook to impose an occupational tax upon the railroad company for the mining of coal that the railroad company, as lessee of the Federal Government, had agreed to mine, the Federal government being under obligations by treaty contract with an Indian tribe to develop the mines from which it had been taken. The sum total of the decision in that case was that "A Federal instrumentality acting under congressional authority cannot be subjected to an occupation or privilege tax by a State." There the Federal government was itself under contract obligations to develop the mines owned by the Indians, it procured its lessee, the railroad company, to fulfill its obligations by mining, in its place and stead, the coal from said mines. To have permitted the imposition of the occupational tax sought to be made in that case would have been to impose such tax by a State directly upon the Federal government, that of course is impossible. No such facts governing the decisions in any of the cited cases exist in the case in hand. It is insisted by the petitioner that he is operating his automobiles and auto buses on the streets of the City of Jacksonville under and by virtue of a "franchise" granted to him by

the commanding officer of a military camp located a few miles from said city, by which he is granted the right to convey the United States soldiers there quartered back and forth between said city and said camp on business or recreation bent. We have examined carefully the documents quoted above that are urged here as being a "franchise" to do the business of an auto bus line in this State, the county of Duval and the municipality of Jacksonville, but we fail to find in any of them any feature or semblance of the grant of a franchise to conduct such business. Even if it be conceded that an army officer has any lawful authority to grant any such "franchise" in a State where he and the troops under him may be quartered, there is in the documents put forward here as constituting such franchise no attempt at any such grant. We grant that if the exigencies of a state of war should demand it a commanding officer of an army may commandeer, seize and utilize privately owned auto buses on the streets or other highways in the transportation of troops and all the other paraphernalia of war, and may do this without payment of any taxes for the operation thereof on the public highways, but when it is asserted that he can go into a State, not under martial law, and there grant franchises to any of its citizens generally to conduct any class of business enterprise within the civil jurisdiction of such State, we very strongly doubt the asserted authority.

But in the documents put forward here as being a franchise there is no attempt at the grant of any such franchise, but on their face they are nothing more than a voluntary contract between a partnership of individuals conducting a general business of carrying passengers and their baggage by auto buses and automobiles to and from points in and around the city of Jacksonville on

the one part, and the commanding officer of a United States encampment of soldiers on the other part, by which in consideration of the furnishing of good auto vehicles with skilled and careful drivers, and of a reduction in the fares to soldiers per man conveyed, and of the observance of certain regulations prescribed as to stopping places, and the giving of preference to soldier passengers over civilians, such commanding officer undertakes to give to said auto partnership a monopoly over all other organized bus lines and automobiles for hire of the right of entrance into said camp grounds and of conveying therefrom the soldiers there encamped. Each soldier individually pays his own fares for being carried back and forth, and the only penalty fixed in the contract for any non-observance of its terms is not a military arrest or other military punishment, but simply a forfeiture of the rights acquired by such contract. The case presented is simply of a firm of individuals residing in Jacksonville engaged in and presumably licensed to do a general business of running auto buses and automobiles for hire over the streets of said city who, as an incident of their general business make a side contract so to speak with an officer in command of an encampment of United States soldiers by which they acquire a monopoly of conveying such soldiers back and forth to and from such camp, and by which for a consideration individually paid by each soldier who becomes a passenger on their line they agree to convey such soldiers back and forth between said city and said camp. The government of the United States having no interest in or ownership over any of the autos used. Under these circumstances we do not think that the petitioner is exempt from the payment of his license tax, and the writ of habeas corpus is, therefore, hereby denied.

WHITFIELD, ELLIS AND WEST, J. J., concur.

BROWNE, C. J., dissents.

BROWNE, C. J., dissenting.—The several orders of Lieu-tenant Colonel Munson, whereby he granted to the peti-tioner the privilege or franchise to operate the bus line between Camp Joseph E. Johnston and the City of Jack-sonville, are set out in full in the opinion of the court. I will, however, quote from the eleventh paragraph of the confirmation of the "privilege" granted to petitioner, which contains some of the reasons for the order:

"II. In the exercise and enjoyment of the exclusive privilege and right herein granted and confirmed to you, you will recognize that my reasons for granting you the same, among other things, are that I have found it essen-tial to the morale of the officers and men stationed at said Camp to permit them to visit said City on private business and for recreation, also to have said provost guards de-tailed for police duty in said City, to prevent said men, as far as possible, from participating in various forms of dis-sipation, and have further found it necessary to the morale of said officers and men to permit their relatives and friends to visit them at said Camp, and have found it necessary also for myself and members of my staff to go to and from said city on official business of the U. S. Government, for which purposes it was essential to pro-vide a means of transportation between said Camp and said City for the officers and enlisted men stationed there, as well as for civilians having occasion to visit said Camp, there being no street car line to said Camp and no other adequate means of transportation available; also that I was desirous of having the entire bus service rendered to said Camp under one management, so that the responsi-

bility for injuries or damage to government men or property would be definitely located and assumed by a responsible party'; also that the greatest possible safety would be obtained to the officers, men and Government property affected by said service.".

The precise question involved in this case has never been determined by the Federal courts, but the doctrines enunciated in cases involving analogous questions, and from the trend of recent decisions, and from the spirit of the times, I have an abiding conviction that wherever the question of the power of a State court to nullify or to review an order made by a military commander in time of war, whereby he contracts for the performance of any service which he considers essential to the morale and safety of the officers and soldiers under his command, it will be determined against such power being exercised by the State courts.

When a nation is at war, its rulers must necessarily be clothed with autocratic and absolute power; less than this may result in failure to accomplish the purpose of the war, if not in defeat and disaster. Neither can the people demand all their constitutional rights, for all rights must be subordinate to and submerged in the great object of winning the war.

The people having elected to engage in a foreign war, they must be prepared to sacrifice their lives, their fortunes, their peace ideals and even their constitutional rights, if need be, to gain an overwhelming victory.

The military arm of the government must not be hampered by local laws, ordinances or regulations. The commanding officer of a military camp is charged with the duty of maintaining the morale of his men and providing for their safety and comfort, and for any dereliction of his duty in these respects he is answerable to military

authority.   When he promulgates an Order, Rule or Regulation, wherein, as in this case he states that he does so because it is "essential to the morale of the officers and men stationed at said camp" and "that the greatest possible safety would be obtained to the officers, men and government property affected by the service," neither a city nor a State has any authority to nullify the effect of his Orders, by requiring the agencies which he establishes or instrumentalities which he uses for the accomplishment of his ends, to pay a license tax for the privilege of performing the duties which he charges them with.

The power to require the payment of an occupational license tax, carries with it the power to impose so great a tax as to amount to a prohibition, and it is quite clear that when the Military authorities in time of war consider certain services which are to be performed by another, necessary for the morale and safety of the army, such services cannot be crippled, hampered, or prevented by the exercise of the licensing power of the State.   If the services which the commanding officer of Camp Joseph E. Johnston considers essential for the morale, and safety of his men, are not in fact necessary, it is a matter for the National authorities to determine, and is not subject to review by the State courts, and we cannot controvert his declaration that the auto service which he has established between the camp and the city of Jacksonville is essential to the purposes stated in Genl. Order No. 33, and the amplification and confirmation thereof made by him on January 5th, 1918.   If he has no authority under military regulations in time of war, to grant the franchise to the defendant, his act is subject to review and disapproval by the military arm of the Nation, and not by the State authorities, and as long as his order remains uncountermanded by the National

authorities, its validity must be respected and given full recognition and obedience.

What the President himself as Commander in Chief of the army may do, attaches to the officer in charge of the military forces at Camp Johnston. As was said by the court in Ex parte Vallandigham, 16, 816 Fed. Cas.: "The only reason why the appointment is made is that the President cannot discharge the duties in person. He, therefore, constitutes an agent to represent him, clothed with the necessary power for the efficient supervision of the military interests of the government throughout the department, and it is not necessary that martial law should be proclaimed or exist, to enable the general in command to perform the duties assigned to him." The last portion of this citation meets the reference in the opinion of this court that this State is not under martial law.

Discussing the power of the courts to annul or reverse the action of a Military Commander in time of war, the court said: "He has done this under his responsibility as the commanding officer of this department, and in accordance with what he supposed to be the power vested in the president by the constitution; and I am unable to perceive on what principle a judicial tribunal can be invoked to annul or reverse it. In the judgment of the commanding general, the emergency required it, and *whether he acted wisely or discreetly is not properly a subject for judicial review.*" The reasons given by Judge Leavitt for holding that a Federal Court has no power to annul or reverse an order of a commanding officer in time of war, apply with greater force to the power of a State Court.

It is contended that because the Military authorities permit the petitioner to transport civilians to and from the camp, when the space in the busses is not wholly

occupied by soldiers, he transcended his authority, and that *ipso facto*, the instrumentality created by him for the benefit of his troops, became subject to the operation of the State and city laws imposing occupational taxes on the petitioner.    To concede this contention, is to assert the authority of State courts to review, modify or annul an order of a Military Commander in time of war; thus, making the States the final arbiters of the wisdom, the necessity or the reasonableness of a military order.    It begs the question to say that the order under which the petitioner is performing the service for which he is being held by the State authorities, was made by the commanding officer of a camp only, and not entitled to the dignity of a military order.    The President of the United States advised Congress to "declare the recent course of the Imperial German Government to be in fact nothing less than war against the United States," and Congress promptly acted on his advice and provided for raising an army to carry on the war.    The duty of organizing, equipping, arming, training, disciplining his huge military machine is the result of Congressional action, and it devolved upon the President of the United States as Commander in Chief of the Army to carry it into effect, and through and by him this authority descends  until it reaches  the commanding officers of camps established for the purpose of preparing the army for war, and every order made by a military officer of a camp for the safety and morale of his officers and men, until revoked or disapproved by his superior in command, is made by virtue of and under the authority of the Commander in Chief of the Military forces of the United States.    To say that the orders of the commanding officer  of a camp  whereby he creates under his command, can be nullified by a city ordinance agencies or instrumentalities for the benefit of the Army

imposing an occupational tax on a person to whom the commanding officer has given a franchise or privilege for what he believes to be essential for the morale and safety of his men, is to strike at the Commander in Chief of the Army himself, under whose authority and command the officer is acting. When Lt. Col. Munson granted to petitioner the privilege or franchise which the imposition of this occupational tax would tend to impede, cripple, or destroy, he acted under authority of Congress and for the President of the United States—as every official act of a Military Commander in time of war, is the act of the Commander in Chief, until disapproved or reviewed by him, or some other military authority acting under him.

It may be that Lt. Col. Munson is mistaken when he says that it is necessary for the morale and safety of his men that civilians who have business at the camp or who desire to visit his officers and men, may be transported in the busses of this transportation line, but such mistake, if it be one, is not reviewable by the State Courts; nor does his mistaken view of its necessity subject to imprisonment by State authorities for non-payment of an occupational tax, the person who is performing the duty imposed upon him by such military order.

The privilege granted to the petitioner by Col. Munson in this instance is no less a franchise than one granted by Congress or any other department of the National Government.

The Federal Courts have passed on the question of the power of the states to destroy or abridge a franchise or privilege granted by the Federal authorities for National purposes, by the imposition of taxes, and the doctrine laid down in these cases decided in time of peace, apply with greater force in time of war.

Osborne v. Bank of the United States, 9 Wheat. (U.S.)

738, is one of the great cases in which Chief Justice
MARSHALL wrote his views into the Constitution of the
United States, and settled the question that a State had
no power to tax an instrumentality of the Federal gov-
ernment, and the court illustrated its reasoning with a
statement which is peculiarly applicable to this case:
"Can a contractor for supplying a military post with pro-
visions, be restrained from making purchases within any
State, or from *transporting the provisions to the place
at which the troops were stationed, or could he be fined
or taxed for doing so? We have not yet heard these
questions answered* in the affirmative. It is true that
the property of the contractor may be taxed, as the
property of other citizens; and so may the local property
of the Bank. But we do not admit that the act of pur-
chasing *or of conveying the articles purchased,* can be
under State control."

Other cases which follow and extend the doctrine of
Osborne v. Bank of the United States, *supra,* are Cali-
fornia v. Central Pac. R. Co., 127 U. S. 1, 8 Sup. Ct. Rep.
1073; San Benito County v. Southern Pac. R. Co., 77
Cal. 518, 19 Pac. Rep. 827.

In the case of Western Union Tel. Co. v. Lakin, 53
Wash. 326, 101 Pac. Rep. 1094, the court said: "The
franchise to do business on and over the highways and
post roads in the United States is not only a permission,
but an advantage to the government, growing out of
the necessities of the administration. In it the Govern-
ment has an interest. Upon it must be placed depend-
ence in time of war and in time of peace. It is a
creature not alone of the bounty of the government. It
is born of its needs, and is essential to its maintenance."

"It requires no argument to sustain the point that a
mere tax on the *privilege of doing business,* which in

one way or another, might interrupt this governmental interest, cannot be sustained."

The transportation line established by Lt. Col. Munson, is born of the needs of the army, or so much of it as is under his command, and "is essential to its maintenance," and is not subject to State regulation or control. If the city can require the transportation line to take out a license as a condition to the right to operate, it can fix and control its tolls, its points and time of departure and return, its routes, and so regulate it as to defeat the purpose for which it was established by the commanding officer of the camp. The power to license including the power to regulate and control, and thus we would have the situation of the orders of a military officer in time of war, subject to control by the city authorities. To illustrate the impotence of municipal ordinances when it is sought to impose their conditions upon the military authorities in time of war, we need only call attention to those which prohibit keeping explosives within the limits of a city. What effect would such an ordinance have on the action of a Military officer who considered it necessary to store ammunition within the corporate limits?

The question in this case is somewhat obscured by the difficulty of thinking in terms of war, and attempting to apply doctrines which might be conclusive in time of peace, but which must yield to the higher authority of National necessity in time of war. To appreciate this distinction I need only call attention to the National Government "having assumed possession and control of the railroads;" the orders of the Fuel and Food Administrators, and the proposed action by Congress to regulate what food we may eat, and on what days we must abstain from eating prohibited articles.

In the case under consideration the Nation in its purpose of carrying on a great foreign war, through the Military Commander of Camp Joseph E. Johnston, is performing a function which it deems necessary for the morale of the Army and the safety of its officers and men, and if the State possesses the power to tax an agency of the Federal Government whereby it performs any of its functions, it might so impose taxation as to "cripple if not wholly defeat the operations of the National authority within its proper and constitutional sphere of action."

Judge Cooley in his work on Constitutional Limitations (7th ed.) p. 680, says: "One of the implied limitations is that which precludes the States from taxing the agencies whereby the general government performs its functions. The reason is that, if they possessed this authority, it would be within their power to impose taxation to an extent that might cripple if not wholly defeat, the operations of the national authority within its proper and constitutional sphere of action."

In the case of Farmers' & Mechanics' Sav. Bank of Minneapolis v. State of Minnesota, 232 U. S. 516, 34 Sup. Ct. Rep. 354, the court said: "A Federal instrumentality acting under Congressional authority cannot be subjected to an occupation or privilege tax by a State."

The petitioner is not only a Federal but a Military instrumentality acting under the orders of the Commanding Officer of Camp Joseph E. Johnston,—a camp, organized by Congressional authority,—and the franchise or privilege granted the petitioner by Lt. Col. Munson for the safety and morale of his men should not be subjected to the imposition of an occupational tax which might cripple if not wholly defeat the purpose for which camps are established—the preparation and training of

the Army to fight in the great foreign war in which we are now engaged.

The power of Congress to create a vast army to be sent out of the country to engage in a foreign war was fully sustained by the Supreme Court of the United States in a decision rendered by Mr. Chief Justice WHITE on January 9th, in the case of Arver. United States, and other cases decided at the same time, known as the Draft Cases. The court said that the "authority to enact the statute must be found in the clauses of the Constitution giving Congress power to 'declare war; * * * to make rules for the government and regulation of the land and naval forces' Art. 1, Sec. 8. And of course the powers conferred by these provisions like are other powers given, carry with them as provided by the Constitution the authority 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.'" Art. 1, Sec. 8.

Whatever is done by the Military authorities in the organization of the army provided for in the Act of Congress of May 18th, 1917, is done by virtue of this Constitutional provision, and the regulation of the army belongs exclusively to the United States Government. If there is any difference in degree in the powers granted to Congress by the National Constitution, the power to declare war, to raise and support armies, to make rules for their government and regulation, is the highest of all for upon it the existence, the integrity of the Nation depends, and the power of Congress over it is absolute.

While the question presented in this case has never been before the Supreme Court of the United States, there is a long line of decisions on the interstate commerce clause of the Constitution, pointing to the conclusion that it will be reached by that Court whenever

this question comes before it, and which guide me in reaching my conclusion.

The power of Congress over interstate commerce is absolute. See Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. Rep. 851, in which case the court said "we have repeatedly decided that a State law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce, no matter how specious the pretext may be for imposing it."

A distinction sought to be made that because the order of the Commanding Officer of Camp Johnston, was not limited to the transportation of the officers and soldiers under his command, but permitted also the transportation of civilians, this license tax may be imposed. The license tax complained of makes no such distinction, but is imposed for the occupation of transporting both the military and civil population, and in this it is obnoxious under the doctrine of the Supreme Court if the United States that licenses for carrying on both interstate and intrastate commerce, are unconstitutional. The States have the right to impose licenses on intrastate, but not on interstate business, and they cannot link them together and impose a license on the entire business. In the case of Osborne v. State of Florida, 164 U. S. 650, 17 Sup. Ct. Rep. 214, a State tax imposed upon an express company for doing business in Florida, was upheld because the act applied solely to business of the company within the State. The court in that case said, "The statute herein differs from the cases where statutes upon this subject have been held void, because in those cases the statutes prohibited the doing of any business in the State whatever unless upon the payment of the fee or tax. It was said as to those cases that as the law made the payment of the fee or the obtaining of the

license a condition to the right to do any business whatever, whether interstate or purely local, it was on that account a regulation of interstate commerce and therefore void." The distinction is clear, that if a license tax is sought to be imposed as a condition to doing a business which includes both interstate and intrastate business, it is void. If, however, the law applies only to intrastate business, it is valid.

Examining the ordinance under consideration, we find that it requires the payment of a fee or tax and the obtaining of a license as a condition to the right to do any transportation business whatever, and includes the transportation of soldiers as well as civilians, and in so far as it does this, it is void.

Although I have discussed this phase of the case, and think it supports my conclusion that the license tax sought to be imposed is inoperative and void, insofar as it affects the business which the petitioner is carrying on, still I rest my conclusion particularly and especially on the lack of authority of the State Courts to pass upon the validity, or the reasonableness of a Military order in time of war, and as the petitioner is being held for not taking out a city license for operating a transportation line between Camp Johnston and Jacksonville, under the authority of an order of the Military arm of the government, his arrest was unauthorized, and he is being unlawfully deprived of his liberty.

When the Nation is engaged in a great foreign war which will tax the patriotism of the people to the extremest limit, when our Nationals are called upon to give their lives without asking their consent, in order that we may win the war, it seems preposterous to contend for the shadow of States rights,—if there remains even a shadow of that sacred doctrine upon which vested

our constitutional liberties;—and make the collection of a few dollars for license paramount to the morale and safety of the soldiers who are called upon to sacrifice their lives for the Nation.

The President of the United States has said "We are now about to accept the gage of battle with the natural foe of liberty, and shall, if necessary, spend the whole force of the Nation to check and nullify its pretentiousness and power." Camp Joseph E. Johnston was established in pursuance of the plan to prepare an army to carry out this declaration of the President, and the establishment of the bus line by Lt. Col. Munson is the exercise of his Military authority to prepare the Army to "accept the gage of battle." The bus line is an instrumentality or agency which the Commanding Officer says is necessary to accomplish this end. Military exigencies or necessities are to be determined by the Military authorities, or at least by the National, and not by State authorities, and a city cannot cripple, hamper, impair or destroy the instrumentalities established to meet a Military necessity or exigency, by passing an ordinance imposing a license tax on such instrumentalities, or by applying to them the provisions of an existing ordinance.

I think the application for a writ of *habeas corpus* should have been granted.