HUGHES TRANSP., Inc.
v.
UNITED STATES.
COMMONWEALTH OF KENTUCKY
v.
UNITED STATES.
No. 525–52.

United States Court of Claims.
May 4, 1954.

Daryal A. Myse, Washington, D. C., Hand & Myse, Washington, D. C., on the brief, for plaintiff.

J. D. Buckman, Jr., Atty. Gen., George M. Catlett, Asst. Atty. Gen., on the brief, for Commonwealth of Kentucky, intervenor.

Lawrence S. Smith, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, and MADDEN, Judges.

LITTLETON, Judge.

This is a suit based upon a contract of carriage by motor vehicle, whereby plaintiff carrier seeks to recover the difference between the amount of freight charges paid plaintiff by the United States (as shipper) and the amounts plaintiff asserts are due it either (1) under the applicable approved Kentucky intrastate tariff, as required by Kentucky law and regulations, or in the alternative (2) under plaintiff's interpretation of the terms of that portion of the contract of carriage which specified the rates to be charged (plaintiff's Quotation No. 29, hereinafter set out in full).

On the basis of plaintiff's original petition, both parties have filed cross-motions for summary judgment and defendant has asserted a counterclaim alleging various overpayments made by it to plaintiff on numerous payments for transportation services performed by plaintiff for defendant. On the occasion of oral argument of the cause in open court, plaintiff was allowed to amend its original petition by the addition of a substantial number of comparable transactions upon which plaintiff seeks judgment on the same grounds as those asserted in its original petition. Defendant also asserts a counterclaim on the amended petition.

Both parties agree (1) that in the event plaintiff is entitled to recover or defendant's counterclaim is allowed, the precise sums involved on the total number of shipments are to be determined by the General Accounting Office, and (2) that the cross-motions for summary judgment are now submitted to the court under Rule 51(e),[1] 28 U.S.C., for determi-

---

1. Rules of the United States Court of Claims, revised October 15, 1953. Rule 51. Summary Judgment:

"(e) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the Court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall, if practicable, ascertain what material facts exist without substantial controversy and what material facts are actually in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the

nation of the basic legal issues involved therein and the determination of such facts as are not in dispute. Rule 51(e) contemplates the entry of an interlocutory judgment reserving any further questions of fact as to the total amounts involved in the recovery, if any.

The material facts, except as hereinafter indicated, are not in dispute. Plaintiff is a South Carolina corporation. Under permits granted by the Department of Motor Transportation of the Commonwealth of Kentucky, plaintiff was authorized to transport the articles involved in this claim over the highways of Kentucky and solely within that State, as a contract carrier by motor vehicle. On March 13, 1950, plaintiff issued Quotation No. 29. This quotation was filed and maintained with the United States Department of the Army until February 19, 1951, and provided as follows:

During the effective period of the above quotation, plaintiff transported for the

"HUGHES TRANSPORTATION, INC.
MEETING STREET ROAD
CHARLESTON, SOUTH CAROLINA

I. C. C. DOCKET No. MC–102682 and SUBS
KENTUCKY PERMIT No. 291 & 536
U. S. Government Quotation No. 29 Cancels U. S. Government Quotation Nos. 24–A, 24–A, Sub. 1, 25–B, 25–B, Sub. 1.

Special Quotation on U. S. Government
Freight Moving on U. S. Government
Bills of Lading

COMMODITY: Class A.—Explosive Ammunition.
TERRITORY: Between Blue Grass Ordnance Depot, Richmond, Kentucky and all points Carrier is authorized to serve.
RATES: Subject to Rail or Motor Truck Rates which ever is lower.

| Minimum Weight | Classification |
| --- | --- |
| 20,000 | 75% |
| *25,000 | 65% |

Less Truck Load Shipments subject to Rail Less Car Load Rates Or Motor Truck Less Truck Load Rates whichever is lower.

*Bills of Lading may be cross referenced on any particular shipment to take advantage of lower classification.

ROUTE: Hughes Transportation, Inc., Charleston, S. C.
EFFECTIVE: March 13, 1950  Date Issued:
EXPIRES: May be canceled upon ten (10) days notice.
Issued By: /s/ X. O. BUNCH, JR.
Vice-President"

Department of the Army numerous shipments of explosive ammunition for cannon with explosive or smoke projectiles, between Blue Grass Ordnance Depot, Richmond, Kentucky, and Ft. Knox, Kentucky (135 miles), and also between Richmond and Camp Breckenridge, at Morganfield, Kentucky (272 miles). Quota-

action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

tion No. 29, on file with the Department of the Army during the period in suit, was never filed with the Kentucky Department of Motor Transportation for approval by that Department, as required by Chapter 281 of the Kentucky Revised Statutes then in effect, and the applicable regulations of the Department issued thereunder (Regulation II–6).[2] Neither plaintiff nor defendant appear to have been aware of the above requirements of Kentucky law throughout the period in question and for some time thereafter.

All of the shipments were made under Government bills of lading in the standard form, and, from time to time, as the transportation was completed, plaintiff filed with appropriate officers of the Department of the Army its bills for such transportation. Plaintiff's bills claimed freight charges, in accordance with Quotation No. 29, at the rate of 81 cents per hundred pounds for such transportation between Richmond and Ft. Knox, and at the rate of 109 cents per hundred pounds for transportation between Richmond and Morganfield. The amounts charged by plaintiff represented its interpretation of Quotation No. 29 and the proper application of such quotation to the first-class rail rates as shown in railroad tariff known as Agent C. A. Spaninger's K. R. C. No. 142. Plaintiff's application of Quotation No. 29 (which, as we have said was not filed with or approved by the Kentucky Department of Motor Transportation) to this first-class rail tariff was correct. However, for the reasons

2. Section 281.590 of the Kentucky Revised Statutes provides:

"It is hereby declared to be the public policy of this Commonwealth to provide for fair and impartial regulation of all transportation subject to the provisions of this chapter, so administered as to recognize and preserve the inherent advantages of each type of motor transportation; to promote safe, adequate, economical and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for such transportation service, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several states and the duly authorized officials thereof, all to the end of developing, coordinating and preserving a state transportation system by motor vehicles as defined in this chapter adequate to meet the needs of this Commonwealth. All of the provisions of this chapter shall be administered and enforced with the view to carry out the above declaration of policy."

Section 281.675(2) of the Kentucky Revised Statues requires that:

"Every contract made by a contract carrier for transportation service shall be just and reasonable, and shall be comparable to the rate charged by any common carrier, and such contract carrier shall furnish adequate, efficient, safe and reasonable service."

Section 281.685 of the Kentucky Revised Statutes provides:

"(1) No common carrier shall charge, demand, collect or receive a greater, less or different compensation for the transportation of persons or property or for any service in connection therewith, than the rates, fares and charges specified in its tariffs and classifications filed with the department and in effect at the time; nor shall any common carrier refund or remit any part of the rates, fares or charges so specified, or make or give any unreasonable preference or advantage to any person, or subject any person to any unreasonable discrimination.

"(2) No contract carrier shall charge, demand, collect or receive a greater, less or different compensation for the transportation of persons or property or for any service in connection therewith than that contained in the contract required to be filed with the department and in effect at the time; nor shall any contract carrier refund or remit any part of the charges specified in the contract, or make or give any unreasonable preference or advantage to any person, or subject any person to any unreasonable discrimination."

Regulation II–6 requires the filing of a bilateral contract under which the carrier proposes to operate, containing the charges to be made. The Regulation further provides that the charges in the contract—

"* * * shall not be less than the minimum charges made by common carriers for the same or similar service * * * except that, if, in the opinion of the Department [of Motor Transportation], a different rate should be made for the service rendered, it may approve same."

hereinafter set forth, we hold that Quotation No. 29 and the rail tariff referred to are not, under the facts and circumstances, applicable in determining the proper and legal rates for the transportation involved in this case. The Comptroller General did not undertake to apply Quotation No. 29 to the rail tariff.

The General Accounting Office audited plaintiff's charges for transportation, and under its interpretation of Quotation No. 29 and by the application, according to the interpretation of that office, of the approved motor freight tariff "Central and Southern Motor Freight Tariff Association, Incorporated, Agent, Kentucky Intrastate Motor Freight Tariff No. 7-A (MF-DMT Ky. No. 14)," determined that the Richmond to Ft. Knox shipments should have been charged at the rate of 67 cents per hundred pounds, and the Richmond to Morganfield shipments at the rate of 87 cents per hundred pounds. Plaintiff's protests against the action of the General Accounting Office were rejected, and in May 1952 the Assistant Comptroller General further considered the case and redetermined the rate for the Ft. Knox shipments to be 43 cents per hundred pounds on the basis of his interpretation of Supplement No. 44 to the Kentucky Intrastate Motor Freight Tariff No. 7-A. (This supplement was not in effect at the dates of the transportation.)

Kentucky Intrastate Motor Freight Tariff No. 7-A was a tariff regularly on file with and approved by the Kentucky Department of Motor Transportation.

Either of the above interpretations of Quotation No. 29 results in freight charges considerably below those required for this transportation by Kentucky law which provides that in the absence of specific approval by the Kentucky Department of Motor Transportation, the contractual charges by a contract carrier shall not be less than the minimum charges of common carriers for the same or similar service. The minimum charges of common carriers for this type of service are to be found in the Kentucky Intrastate Motor Tariff

No. 7-A, which tariff was the one used by the General Accounting Office in its attempt to arrive at what is considered to be the proper rates under the provisions of Quotation No. 29. However, if Quotation No. 29 is not applicable because it was not filed with and approved by the Kentucky Department of Motor Transportation, then the motor tariff rates for the transportation of ammunition, as shown in the Intrastate Motor Tariff 7-A, clearly require a charge of 204 cents per hundred pounds for the Ft. Knox-Richmond shipments, and 266 cents per hundred pounds for the Richmond-Morganfield shipments.

We are of the opinion that the interpretation of the General Accounting Office of Quotation No. 29 and its application to Kentucky Intrastate Motor Freight Tariff No. 7-A, under the interpretation by that office, were incorrect. However, for the reasons hereinafter stated, we find it unnecessary to discuss this decision of the General Accounting Office.

It is plaintiff's position that inasmuch as the contract of carriage involved transportation over the highways of the Commonwealth of Kentucky, between points wholly within Kentucky, the contract was one for *intrastate* transportation and as such is governed by Kentucky law; that in the absence of approval by the Kentucky Department of Motor Transportation of a quotation for a contract for rates lower than those applicable to intrastate motor common carriers, under tariff 7-A, for the same or similar transportation, those motor common carrier rates must be applied; that plaintiff is accordingly entitled to judgment on the basis of the applicable motor common carrier rates contained in the approved Kentucky Intrastate Motor Tariff No. 7-A, the precise amount to be determined after an audit by the General Accounting Office.

The Commonwealth of Kentucky has been allowed by the Court to intervene as a party plaintiff, inasmuch as it appears that the Commonwealth has a real and legitimate interest in seeing that its

tariffs are applied according to its laws and regulations. It is intervenor's position that the collection by plaintiff from the United States of any charges for motor transportation over its highways, between the Kentucky points involved, at less than the full applicable rates contained in Kentucky Intrastate Motor Tariff No. 7–A, supra, would be unlawful under the laws and regulations in force in Kentucky, and that judgment for any amount less than that required by such tariff would impair the integrity of Kentucky's motor carrier rate regulatory system.[3]

Defendant resists plaintiff's effort to collect freight charges which are required by Kentucky law on the following grounds: (1) that the Commonwealth of Kentucky cannot constitutionally regulate activity at, or transactions within, an enclave over which the United States has exclusive jurisdiction; (2) that if the law of Kentucky *is* applicable to this transaction as involving intrastate shipments, the Court of Claims does not have jurisdiction to award judgment on the basis of rates in excess of those indicated in Quotation 29, because to do so would amount to rendering a judgment

based on a contract implied in law; (3) that if this court should hold adversely to defendant on the first two contentions above, then plaintiff still may not recover because plaintiff is estopped to assert against the United States any rates higher than those allowed by Quotation No. 29.

We consider first the defendant's contention relative to the effect on this contract of carriage of the exclusive Federal jurisdiction over the three Federal enclaves located in Kentucky and between which the transportation in question took place.

Where the United States has acquired property within a State in the manner and for the purposes provided for in Article I, Sec. 8, clause 17 [4] of the Constitution of the United States, the jurisdiction of the Federal Government *within the confines of the resulting enclave* is in general exclusive, in the absence of valid reservations by the State in consenting to the Federal acquisition. Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091.[5] Even in the absence of such reservations in the State's consent, however, state laws in effect at the time of Federal acquisition [6]

3. In Steele v. General Mills, 329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402, reversing 5 Cir., 154 F.2d 367, a suit by the carrier to recover freight charges prescribed in the tariff issued by the Texas Railroad Commission, despite a contract for a lower rate, the Attorney General of Texas was permitted to intervene in the interest of the integrity of that State's regulatory system.

4. "Sec. 8—Powers of Congress
1. "The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, * * * and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * *."

5. The enclave in the Surplus Trading Co. case had been acquired by the United States with the consent of the legislature of the State of Arkansas without reservation. In a suit by the collector of taxes for Pulaski County, Arkansas, to enforce payment by the Surplus Trading Company of taxes on blankets purchased by the company and located both on and off Fort Pike, the court held that private personal property situated on the enclave could not be taxed by the State.

6. Provisions of the Kentucky Revised Statutes—1942 appearing in Chapter 281, which rendered the rates indicated in Quotation 29, illegal and in violation of Kentucky law regulating rates of contract carriers by motor vehicle were substantially the same as those in the Act of March 11, 1942, Chapter 185 of the Laws of Kentucky, in effect prior to the acquisition by the United States of those portions of the federal enclave involved in this suit.

not inconsistent with federal law,[7] and not detrimental to the purposes for which the enclave was established, have been held to remain in effect on the enclave until abrogated by Congress. James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596;[8] Chicago, R. I. & Pacific Ry. Co. v. McGlinn, 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270.[9]

The courts have held that state statutes calling for penalties cannot be enforced against contractors with the federal government where the act to which the penalty was applicable took place entirely upon a federal enclave over which the Government had exclusive jurisdiction.[10] It has also been held that a state license tax cannot be imposed on companies with respect to transactions or contracts with the federal government which took place substantially within the confines of a federal enclave.[11]

In at least two cases the courts have held that a federal enclave over which the United States has acquired exclusive jurisdiction, remains part of the state geographically, and to some extent is subject to municipal regulation. Howard v. Commissioners of the Sinking Fund of the City of Louisville,[12] 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617; City of Wichita Falls v. Bowen,[13] 143 Tex. 45, 182 S.W.2d 695.

7. Defendant's contentions regarding possible conflict with federal statutes, will be considered hereinafter.

8. In a suit against a contractor engaged in constructing a post office for the United States on a federal enclave, the plaintiff was allowed to recover for the wrongful death of the deceased, an employee of the contractor, on the ground that the New York statute prescribing certain safety measures to be taken on construction work of the type in question was applicable to the construction on the enclave, the statute having been in effect prior to and at the time of the Government's acquisition of the conclave. The fact that enforcement of the New York law might well increase the cost of construction to the government was held not to be such a handicap to the Government's efforts as to require the local enactment to give way.

9. Plaintiff in this case was allowed to recover of the railroad company for the value of a cow killed by the engine within the limits of Fort Leavenworth Military Reservation in Kansas, under a State law in existence at the time the enclave was acquired by the United States and held not to be inconsistent with existing laws of the federal Government.

10. Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761; Western Union Telegraph Co. v. Chiles, 214 U.S. 274, 29 S.Ct. 613, 53 L.Ed. 994.

11. Standard Oil Co. v. People of State of California, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775; in Ralph Sollitt & Sons Construction Co. v. Commonwealth of Virginia, 161 Va. 854, 172 S.E. 290, 91 A.L. R. 774, the imposition of a state license tax upon an Illinois corporation qualified to transact business in Virginia, was upheld by the court where a substantial part of the corporation's work on a construction contract with the United States for the building of a federal post office on a federal enclave required the use of streets outside of, but adjoining, the Government property. See 91 A.L.R. at page 779.

12. In the Howard case the Supreme Court said 344 U.S. at pages 626, 627, 73 S.Ct. at page 467:
"* * * A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction to which we must give heed."

13. In the City of Wichita Falls case, the court upheld the right of the City to annex Kell Field and Sheppard Field, and held that the strip of Route 70 which ran through both federal enclaves

The courts have held that local (State or municipal) regulatory laws are applicable to carriers using the public highways to transport Government employees or soldiers from points outside federal enclaves to points inside such enclaves, under contracts with federal officials on the enclaves. In Baltimore & Annapolis Ry. Co. v. Lichtenberg, 176 Md. 383, 4 A.2d 734 (Md.), Lichtenberg, an independent contractor engaged in intrastate motor transportation, had a single and exclusive contract for a limited period with an official of the United States, under which he transported from Baltimore, Md., men employed by the United States to Government construction projects located on sites near Annapolis, on both sides of the Severn River. Lichtenberg did not have the permits required by Maryland law and was not conforming to the State's regulations, including rates, regarding motor transportation. Upon the complaint of the Baltimore & Annapolis Railroad Co., the Public Service Commission of Maryland ordered the operation in question stopped as an illegal use of the State's highways between Baltimore and the Government property. When the Government was unable to secure the same services elsewhere at the low price contained in its contract with Lichtenberg, it joined in a proceeding to preserve the contract with Lichtenberg. Among other things, the federal government pointed out that it did not have

funds to pay more than the contract rate for the carriage of these laborers. The court upheld the power of the State Commission to issue the order stopping the transportation being performed by Lichtenberg under his contract with the Government, stating (1) that the federal government's lack of authorization for the expenditure of more funds than were committed to the Lichtenberg contract did not justify the bringing into operation upon Maryland highways a system of conveyance outside Maryland law; (2) that Lichtenberg, as a contract carrier for hire, was using the Maryland roads on fixed schedules between fixed termini within the geographical limits of the state, and that the naval grounds were such a fixed termini within the meaning of the state's regulatory statute; and (3) that the state regulatory statute bore a reasonable relation to highway preservation and the safety of the passengers carried over its roads. See also Ex parte Marshall, 1918, 75 Fla. 97, 77 So. 869, L.R.A.1918C, 944.

■ In the instant case the contract of carriage involved the transportation of property belonging to the federal government as shipper-consignee, by a contract carrier by motor vehicle licensed to do business in the Commonwealth of Kentucky. The performance of the contract necessitated the use of state highways between federal enclaves [14] located wholly within the geographical bound-

became a city street. A City ordinance imposing a tax on gross income of those operating busses for hire over the city's streets, and fixing rates, was held to be enforceable against Bowen, with respect to his transportation of passengers within the limits of Sheppard Field, under contract with the Commanding officer.

14. It appears that the federal enclaves involved in the instant case were acquired by the United States in various ways over a long period of time and with the virtually unqualified consent of Kentucky. Act of August 16, 1892, Acts of the General Assembly, Laws of Kentucky 1891, 1892, and 1892–93, p. 227; Kentucky Revised Statutes 1942, Chap. 3, 3.010 (§ 2376). Paragraph 3.030 of the Kentucky Revised Statutes 1942, relates specifical-

ly to Fort Knox. The Kentucky District Court for the Western District of Kentucky held that the Commonwealth's consent to the acquisition of the lands now occupied by Fort Knox did not reserve in the state the right to levy any character of tax against property owned or privileges enjoyed within the confines of the fort. Falls City Brewing Co., Inc. v. Reeves, D.C., 40 F.Supp. 35. The Kentucky Court of Appeals has held that the State courts have no jurisdiction to try persons for crimes committed within the limits of Fort Knox. Commonwealth v. King, 252 Ky. 699, 68 S.W.2d 45. A curious exception to the general rule of exclusive federal jurisdiction over Fort Knox appears in the case of Atcher v. Elizabethtown Lincoln-Mercury, Inc., Ky., 1952, 249 S.W.2d 743. In that case the

aries of Kentucky. Except for the pickup and unloading of the property being transported, it was impossible for the plaintiff to perform his contract of motor carriage without the use of the State's highways. Accordingly, since the contract was substantially and almost entirely performed outside the confines of the federal enclaves, we are of the opinion that it does not fall within the exclusive jurisdiction of the federal government. Ralph Sollitt & Sons Construction Co. v. Commonwealth of Virginia, supra; Baltimore & Annapolis Railroad Co. v. Lichtenberg, supra. We do not agree with defendant that transportation over a State's highways between two federal enclaves, located within a single State, amounts to interstate commerce. There is no federal legislation to support this view and there is nothing in the definition of "interstate commerce" in the Federal Motor Carrier Act which supports such a conclusion.[15]

We have carefully considered the decision of the 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, in the case of Kansas City Southern Railway Co. v. The Louisiana Public Service Commission, rendered May 18, 1953, but we find ourselves unable to agree with the conclusion there reached. In that case the carrier was a railroad which had a contract for the transportation of gasoline from Lake Charles, Louisiana, to Barksdale Air Force Base, also in Louisiana, a federal enclave within the exclusive jurisdiction of the United States. The rate agreed upon was less than that established by the Louisiana Public Service Commission and, after a hearing, that body set the contract aside as being in Louisiana intrastate commerce, subject therefore to State regulation as to rates, service, etc., and in violation of a validly issued general order of the Commission. The State court, upon application of the railroad, set the Public Service Commission's order aside as null and void on the ground that the shipments were interstate in character because delivery was to be made on a federal enclave. The court reached this conclusion on the authority of its decision in the case of Natural Gas and Oil Corp. and Murphy Corp. v. William A. Cooper, Collector of Revenue of the State of Louisiana, rendered July 21, 1952, holding that *land* over which the federal government has acquired exclusive jurisdiction is beyond the power of the State in which it is physically located to *tax* or control, citing Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455. We are in complete accord with the holding in the Louisiana *tax* case but do not think it is applicable to the facts in the transportation case for the reasons stated earlier herein and on the authority of the cases discussed. Aside from the Louisiana case relied on by defendant, we know of no decision, and have been unable to find any case, holding that such transportation is in interstate commerce nor can we see how the shipments in question fall within the subjects over which Congress intended the federal government to have sole regulatory power.[16] See Kelly, Director v. State of Washington ex rel. Foss Co.,

---

appellate court upheld the jurisdiction of the lower state court in an automobile accident case where the accident occurred on a state highway (U. S. Route 60) running through Fort Knox. It appeared that although the accident occurred within the limits of the fort, the land on which the road was constructed had been acquired in 1930 by the State from private persons as a right-of-way for the construction of the highway; that when the federal government condemned land belonging to the same private persons for inclusion in Fort Knox, the acquisition was subject to existing easements; and that the right-of-way on which highway 60 was constructed was such an easement and remained within the jurisdiction of the Commonwealth of Kentucky.

15. 49 U.S.C.A. § 303(10), provides:
"The term 'interstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water."

16. In Hanley v. Kansas City Southern Ry. Co., 187 U.S. 617, 23 S.Ct. 214, 47 L.Ed. 333, cited by defendant, the

302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3; Stoutenburgh v. Hennick, 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637, 23 Op.Attys.Gen. 299.

We hold that the contract for the transportation in question involved shipments moving in intrastate commerce; that the performance of the contracts necessarily involved the exclusive use of Kentucky highways over which the Commonwealth of Kentucky and not the federal government has jurisdiction, and that Kentucky is not attempting to regulate activity at, or a transaction within, the federal enclaves, but rather the use of Kentucky highways outside such enclaves.

Defendant's next contention is that assuming the contract to be one for intrastate carriage of freight subject to the regulatory laws of the Commonwealth of Kentucky so that the state statutory rate is the only one which can be legally applied to the shipments in question, recovery in this court on the basis of that rate is precluded by the doctrine that the Tucker Act does not authorize suits against the United States on "implied in law" contracts. As the doctrine has been developed in this court, it has a definite and specific meaning which stems from its origin and, in our opinion, renders it inapplicable to this case under the facts and circumstances herein.

Defendant cites Goodyear Tire & Rubber Co. v. United States, 62 Ct.Cl. 370, affirmed 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575; Sutton v. United States, 55 Ct.Cl. 193, affirmed and modified 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; Merritt v. United States, 58 Ct.Cl. 371, affirmed 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643; United States v. Minn. Investment Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911; Baltimore & Ohio R. R. v. United States, 57 Ct.Cl. 140, affirmed 261

U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816. The cases cited undoubtedly state the law with respect to "contracts implied in law" as the phrase is used in those opinions. They are inapposite here. A definitive statement of the theoretical distinctions between contracts "implied in fact" and those "implied in law" is not required, in order to make apparent the inapplicability of the rationale of the cited cases to the situation here presented. We reject attempts at taxonomical arrangement of the two concepts in favor of a consideration of the reasons behind the rule. Thereby, the solution is made more meaningful and much simpler.

It should be noted at the outset that the term "implied in law" or "quasi-contract" does not appear in our jurisdictional statute. 28 U.S.C. § 250 *. The language is:

"All claims (except for pensions) founded * * * upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable: * *."

The earliest statute applicable to this court, the Act of February 24, 1855, 10 Stat. 612, provided that the court should hear and determine claims "founded * * * upon any contract, express or implied, with the government of the United States * * *." In the amendatory Act of March 3, 1863, 12 Stat. 765, making the court a United States court in the fullest sense, the contract jurisdiction remained unchanged. In the Act of March 3, 1887, 24 Stat. 505, the Tucker Act, the court's jurisdiction was expand-

---

Supreme Court held that the State of Arkansas did not have jurisdiction to fix a through rate between points in Arkansas where the actual transportation took place partly outside the State in Indian Territory or in Texas. Fifty-two miles of the route lay in Arkansas and nearly six-

ty-four in the Indian Territory. The State's action was held void as interfering with the power of Congress to regulate commerce among the several states and with the Indian tribes.

* Now 28 U.S.C.A. § 1491.

ed to include claims founded upon the federal constitution and, following the above quoted contract provision, there was added the language:

" * * * or for damages, liquidated or unliquidated, in cases not sounding in tort * * *."

The Tucker Act language in this matter was adopted in the Act of March 3, 1911, § 145, 36 Stat. 1087, 1136, and remains unchanged today.

The sort of implied, or, more accurately, *quasi* contract, on which the Government could not be held liable was defined by the courts long before the passage in 1855 of the original act creating the Court of Claims. Although the Government could not be sued prior to 1855, defendants in suits brought against them by the United States were permitted to assert against the United States certain claims by way of set-off.[17] In such cases it was early established that the Government was not responsible, on the theory of implied or *quasi* contract, for the laches, however gross, of its agents. United States v. Kirkpatrick, 1824, 9 Wheat. 720, 6 L.Ed. 199; Dox v. U. S. Postmaster-General, 1828, 1 Pet. 318, 7 L.Ed. 160.[18] The reason for the rule is stated in the Kirkpatrick case by the Supreme Court, Story, J., as follows:

"Then, as to the point of laches, we are of opinion that the charge of the court below, which supposed that the laches will discharge the bond, cannot be maintained as law. The general principle is that laches is not imputable to the government; and this maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy. The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions. It would, in effect, work a repeal of all its securities. On the other hand, the mischiefs to the agents and their sureties would be scarcely less tolerable."

After the passage of the Act of March 3, 1863, permitting suits against the Government in the Court of Claims, founded upon any contract, "express or implied," with the United States, the courts applied the rationale and holdings of the earlier cases just discussed in defining the limits of the new Act's grant of jurisdiction.

In Gibbons v. United States, 1866, 2 Ct.Cl. 421, the plaintiff had a contract to deliver 200,000 bushels of oats to the Government within thirty days. Without any cause, and although the oats were offered in time, the responsible Government official refused to receive the oats and the plaintiff, at the expiration of the thirty days, notified the Government that he considered the contract terminated. Thereafter, the price of oats increased and the Government's official demanded that the balance of the oats, previously refused by him, be delivered at the contract price, accompanied by the threat that unless plaintiff complied, the Government would buy the oats in the open market and withhold the difference in price from moneys otherwise due plaintiff. The suit was to recover the difference between the market price of the oats delivered by plaintiff under duress, and the price paid. This court denied plaintiff re-

17. In United States v. Bank of Metropolis, 1841, 15 Pet. 377, 10 L.Ed. 774, the United States brought an action against the bank in assumpsit to recover money. Defendants claimed a sum in credit as a debt to it by the United States on which it could not, of course, sue the United States. Since the debt was authorized, the defendant was allowed the set-off.

18. Both suits were brought by the United States against the sureties of a Government official on bonds given for the faithful performance of the official's duties. The sureties urged that the claim of the United States upon them was released by the laches of the officer to whom the assertion of the claim was intrusted.

covery on this claim, stating, 2 Ct.Cl. at page 428:

> "If the Government refused to receive the oats under the contract, when they were offered in proper time, it will not be permitted to compel a delivery of them after its right to demand them had ceased; and this the claimant should have known. Hence he cannot recover the difference in price between that named in the contract and that ruling in market after its expiration for the oats subsequently delivered under the assumed compulsory power of the quartermaster."

Upon Gibbon's appeal to the Supreme Court that court affirmed the judgment of the Court of Claims, 8 Wall. 269, at pages 274–276, 19 L.Ed. 453, and stated:

> "But it is not to be disguised that this case is an attempt, under the assumption of an implied contract, to make the government responsible for the unauthorized acts of its officer, ·those acts being in themselves torts. No government has ever held itself liable to individuals for the *misfeasance, laches,* or *unauthorized exercise of power by its officers and agents.* [Italics supplied.]
>
> "In the language of Judge Story [Story on Agencies, § 319], "it does not undertake to guarantee to any person the fidelity of any of the officers or agents whom it employs, since that would involve it in all its operations in endless embarrassments, and difficulties, and losses, which would be subversive of the public interests." [United States v. Kirkpatrick, 9 Wheat. 720 [6 L.Ed. 199;] Dox v. [U. S.] Postmaster-General, 1 Pet. 318, [7 L.Ed. 160;] Conwell v. Voorhees, 13 Ohio 523.]
>
> "The creation by act of Congress of a court in which the United States may be sued, presents a novel feature in our jurisprudence, though the act limits such suits to claims founded on contracts, express or implied, with certain unimportant exceptions. But in the exercise of this unaccustomed jurisdiction, the courts are embarrassed by the necessary absence of precedent and settled principles by which the liability of the government may be determined. In a few adjudged cases where the United States was plaintiff, the defendants have been permitted to assert demands of various kinds by way of set-off, and these cases may afford useful guidance where they are in point. [Citing the Kirkpatrick and Dox cases.]
> * * *
>
> "The language of the statutes which confer jurisdiction upon the Court of Claims, excludes by the strongest implication demands against the government founded on torts. The general principle which we have already stated as applicable to all governments, forbids, on a policy imposed by necessity, that they should hold themselves liable for unauthorized wrongs inflicted by their officers on the citizen, though occurring while engaged in the discharge of official duties.
>
> "In the absence of adjudged cases determining how far the government may be responsible on an implied assumpsit for acts which, though unauthorized, may have been done in its interest, and of which it may have received the benefit, the apparent hardships of many of such cases present strong appeals to the courts to indemnify the suffering individual at the expense of the United States.
>
> " These reflections admonish us to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a remedy,

Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims."

Whitside v. United States, 93 U.S. 247, 23 L.Ed. 882, was a suit for damages for breach of an implied contract on the part of the United States to pay for the transportation, etc., of abandoned or captured cotton, where the agent of the Treasury Department was without any authority to bind the United States by contract or to do the act on which the contract alleged might have been implied. The Supreme Court held the claim unenforceable under the Court of Claims Act and stated, 93 U.S. at page 256:

"Different rules prevail in respect to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. Principals, in the latter category, are in many cases bound by the acts and declarations of their agents, even where the act or declaration was done or made without any authority, if it appear that the act was done or declaration was made by the agent in the course of his regular employment; but the government or public authority is not bound in such a case, unless it manifestly appears that the agent was acting *within the scope of his authority, or that he had been held out as having authority to do the act, or was employed in his capacity as a public agent to do the act or make the declaration for the government.* * * * [Italics supplied.]

" * * * it is better that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public * * *"

In Langford v. United States, 1879, 101 U.S. 341, 25 L.Ed. 1010 the Court was asked to decide whether it could imply on the part of the United States a contract to pay for land wrongfully taken by an agent of the United States, under the act permitting suit on claims founded upon contracts "express or implied". At page 345, of 101 U.S., the Court stated:

" * * * There can be no reasonable doubt that this limitation to cases of contract, express or implied, was established in reference to the distinction between actions arising out of contracts, as distinguished from those founded on torts, which is inherent in the essential nature of judicial remedies under all systems, and especially under the system of the common law."

Upon the authority of Nichols v. United States, 7 Wall. 122, 19 L.Ed. 125, and Gibbons v. United States, 8 Wall. 269, 19 L.Ed. 453, the Supreme Court held that the Act, March 3, 1863, 12 Stat. 765, did not permit recovery from the United States on the basis of contracts implied from the unauthorized or tortious acts of the Government's agents since to do so would be to "fritter away the distinction between actions *ex delicto* and actions *ex contractu,* which is well understood in the common law and under our system of jurisprudence, and thereby subject the government to payment of damages for all the wrongs committed by its officers or agents, under a mistaken zeal, or actuated by less worthy motives."

With the passage of the Tucker Act in 1887, 24 Stat. 505, Congress in effect codified the rule early established and often expressed by the courts, that the United States would not be held liable in the Court of Claims on a suit for damages for breach of a contract either express or implied, where the act of the Government agent was tortious.

In addition to those situations where the courts have refused to imply an enforceable contract on the basis of unauthorized[19] or tortious acts of a Gov-

19. Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; United States v. Minnesota Mut. Investment Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed.

ernment agent, the courts have also declined to imply a contract on the part of the United States to pay for services rendered under circumstances where, although there was authority in the federal agent to make the contract alleged, the element of *consent* was wholly lacking and could not reasonably be implied from the facts and circumstances and the acts of the Government representatives.[20] Even in those instances where the Government actually derived a benefit from the services of a private individual, the courts have still refused to imply an obligation on the part of the United States to pay, although as between private parties such an obligation or contract to pay would be implied on the theory that natural equity required such payment in order to prevent the unjust enrichment of the recipient of the benefits. One line of cases in this field concerns the situation in which the claimant was a volunteer, rendering services to the United States without having received a request therefor and under circumstances where such a request could not reasonably be implied. Coleman v. United States, 152 U.S. 96, 14 S.Ct. 473, 38 L.Ed. 368; La Fontain v. Hayhurst, 89 Maine 388, 36 A. 623; Baltimore & Ohio R. R. Co. v. United States, 261 U.S. 385, 43 S.Ct. 384, 67 L.Ed. 711. In another closely related line of cases, the courts have refused to imply a contract on the part of the United States where the facts clearly indicated an intent on the part of the Government *not* to enter into the contract which the courts might have implied as between private parties. For example, where the law of

a particular state permitted a landlord to collect a year's rent from a so-called holdover tenant, the courts have refused to require the United States as a tenant to pay for more than the period of actual occupancy, where the United States, prior to the expiration of the express lease, had affirmatively refused to enter into a lease for a further year and had announced to the landlord that it would pay only for any additional time during which it actually occupied the landlord's premises. Goodyear Tire & Rubber Co. v. United States, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575.[21]

■ A careful study of the cases dealing with the contractual liability of the United States, and holding that so-called "implied in law" or *quasi* contracts are outside the jurisdiction of the Court of Claims, impels the conclusion that under the arrangements that were made and the other facts and circumstances, the instant case involves no such *quasi* contract.

In the case before us the Government agent had full authority to contract with plaintiff for the transportation services in question. He did so contract and the contract was actually made and the services were performed. The Government agent also had authority to enter into a contract which would be valid under Kentucky law in all respects, including the payment of the freight rates required by Kentucky law and approved Intrastate Motor Transportation tariff. There was no federal statute in existence prohibiting such a contract (certainly not the Federal Motor Carrier Act, 49 U.S.C.A. § 301 et seq.) or even affecting

911; Baltimore & Ohio R. R. Co. v. United States, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816.

20. In Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643, the Supreme Court held that the claimant failed to allege in its petition any facts which would afford any basis for a claim that repayment by the prime contractor to the Government of overcharges was exacted by the Government for the benefit of claimant-subcontractor.

21. Neither the Court of Claims nor the Supreme Court attempted to resolve the issue, argued at some length by the parties, as to what precisely was the nature of the tenancy that arose after the expiration of the *written lease*, within the meaning of the common law of Ohio. They merely held that in view of the Government's affirmative acts and statements, a promise to lease the premises for another year could not be implied. As pointed out in the Government's briefs, a contract for less than a year was by no means illegal under Ohio law.

such a contract, and no affirmative act of the Government agent negatived the resulting presumption that the agent intended to contract pursuant to Kentucky law, the same as individuals would contract. The dispute which developed ultimately over the proper rate of payment for the services rendered by plaintiff did not involve a disagreement over the applicability of the regularly published and approved Kentucky tariff and the Kentucky law to this type of shipment, but rather over the proper interpretation of the carrier's Quotation No. 29 and its application to the approved Kentucky tariff, which, unknown to both parties to the contract of the carriage at the time of the agreement, could not, under any possible interpretation (of Quotation No. 29), result in the regularly published rate. We do not think that the Government's action in ordering the shipments after the issuance of this erroneous Quotation No. 29, amounted to an affirmative declaration by its duly authorized agent that it would not contract for a rate valid under the approved Kentucky tariff and Kentucky statutory law, because the actions of both parties to the contract indicated that they understood and intended that freight rates lawful under Kentucky statutes should apply. Neither party knew that Quotation No. 29 did not embody such lawful rates.

This, then, was an express contract, complete in every detail as to the service to be rendered, for carriage of specific freight between fixed termini within the limits of the Commonwealth of Kentucky. The contract was fully authorized, executed and performed, and was valid and enforceable under Kentucky law in all respects, except as to the freight rates specified by the carrier in its quotation, when the shipments in question were made. If the Government had paid on the basis of a quotation containing rates higher than the regularly published tariff, it would clearly and without question have had the right under Kentucky law to collect the difference as an overcharge. Permitting the carrier to recover on the basis of the regularly published and approved rate would not represent any attempt to adjust equitably relations not clearly contractual, since there was in existence an express contract. But in our opinion plaintiff and the intervenor, the State of Kentucky, are not attempting to enforce a *quasi* contract but an express contract, perhaps to some extent implied, in fact.

This appears to be a case of first impression to some extent. We apply, therefore, an orthodox line of authority which clearly holds that the rate obligation of a transportation contract of this kind is not a "contract implied in law," as that doctrine is applied to limit the jurisdiction of this court. Rather, the rate in a transportation contract is not a matter for contract at all if the rate applicable to the shipment is contained in a tariff regularly approved and published under either the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., or a valid state regulatory statute. Such a rate is one "established by law" with respect to any contract involving that particular shipment, and the courts have held that the legally published tariff of a carrier may not be avoided, enlarged, or varied by the shipper or carrier "by contract, express or implied, or by the tort of the carrier." United States v. Kansas City Southern Ry. Co., D.C., 116 F.Supp. 484, 487. In the instant case the Government's defense represents an attempt to vary the published tariff for the shipment in question by an express contract for a lower rate, or to ignore it entirely. Plaintiff's suit, on the other hand, is not an attempt to recover from the United States on the basis of an implied-in-law contract, but rather to recover on the basis of a tariff or rate which has been established by applicable Kentucky law imposing upon plaintiff not only the right, but the absolute duty to charge and collect such rate, and a like duty upon the shipper to pay it.

The defendant suggests that the Government, because it is the sovereign, is not bound by the same rules that govern transportation contracts entered into between private persons, and that there-

fore federal law, i. e., Section 22 of the Interstate Commerce Act, and not Kentucky law, governs the instant contract.

■ In general, the courts have held that in the absence of some applicable federal statute to the contrary, the Government, when it contracts with its citizens, subjects itself to the same rules of law that govern private individuals. In our opinion that rule is applicable here. In Standard Oil Co. of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 212, 69 L.Ed. 519, involving a suit or libel upon two policies of war risk insurance issued by the Government to the claimant, the Government resisted, among other things, the allowance of interest on the claims. In holding for the claimant on this point the Court stated:

> " * * * When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business."

In United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65, reversing Lovett's Case, 9 Ct.Cl. 479, the Government occupied plaintiff's premises under a lease which provided nothing in express terms except the amount of rent reserved and the term of occupancy. The claimant sued for damages occasioned by the Government's failure to repair. The Court pointed out that as between private parties an obligation would be implied, under the circumstances of the case before it, on the part of the lessee to so use the premises as not unnecessarily to injure it. In holding that the United States, as a tenant, was likewise bound, the Court stated, 94 U.S. at page 66:

> "The United States, when they contract with their citizens, are controlled by the same laws that govern the citizens in that behalf. All obligations which would be implied

against citizens under the same circumstances will be implied against them."

In Pocono Pines Assembly Hotels Co. v. United States, 73 Ct.Cl. 447, at page 482, the court, in discussing the jurisdiction of the Court of Claims, stated:

> "In contract cases it was early decided that the rules of law applicable to contracts between individuals apply to authorized contracts with the Government—that as to these, the Government abandons its sovereignty and submits the claims to adjudication as in other cases of contract. United States v. State Nat. Bank, 96 U.S. 30, 24 L.Ed. 647."

What then is the law governing private citizens contracting under the same circumstances as the Government and the carrier in this case?

■ Transportation contracts, like contracts for services in most of the other states or federally regulated industries, such as communications and power and light, etc., are fundamentally different from the ordinary contract in that the respective duties of the contracting parties are carefully defined by statute, and their rights—indeed, their very freedom to contract in certain respects—are strictly limited by those statutes regardless of the parties' knowledge of those restrictions or of their manifest desire to contract otherwise.[22]

In the field of interstate transportation, the Interstate Commerce Act and the Federal Motor Carrier Act are two of the regulatory statutes. Most of the states, including Kentucky, have enacted similar laws under the police powers reserved to the states, regulating intrastate transportation and contracts of carriage involving the use of their highways for such transportation. The usual statutory limitations imposed on the freedom of contract in these fields relate to the services to be rendered, the per-

22. Williston on Contracts, Rev.Ed., Vol. 1, § 32A, Vol. 6, §§ 1071, 1073; *The Filed Rate in Public Utility Law—A Study in Mechanical Jurisprudence*, by Gustavus H. Robinson, 77 U. of Pa. Law Review, p. 213.

missible amount of return on investment, and the rates that may be charged.

These regulatory laws in the field of transportation and public utilities have been held to be an expression of society's intention that these particular industries shall deal with their customers on a basis of equality of treatment, as a matter of *public policy* and in the best interests of the public. These laws usually provide that the charges or rates be publicly filed, and approved, and that once published, they be strictly adhered to by both user and supplier regardless of any other considerations, or attempts to evade them innocently or otherwise.

In the field of transportation, both the private shipper and the carrier are charged with knowledge or notice of the published rate and the statutory law as long as they are in force, and that rate is *by law* a part of the transportation contract in the same manner as though it were a statute.[23] Contracts of carriage specifying a rate other than the statutory rate cannot be enforced in the courts as to such illegal rate, nor will recovery be allowed for damages for breach of the rate provision of such contract. Strict adherence to that doctrine by the courts frequently results in what

might appear as apparent unfairness to the individual shipper or user, when viewed in the light of generally accepted standards of equity and justice, since the shipper to whom an illegally low rate has been quoted by the carrier may, in ignorance of the established rate and in good faith, enter into contracts with others on the basis of such erroneous quotation. Requiring such a shipper to pay the higher rate or rates, established by approved tariffs and statute, may well result in serious monetary losses to the shipper, when viewed in the light of the illegal quotation. However, the courts have uniformly permitted such a carrier to collect the higher published rate regardless of the carrier's negligence or actual fraud in quoting the lower rate, since otherwise "a wide door would be thrown open for an evasion" of the express purpose of the regulatory statute, and the public policy designed to benefit the public as a whole would be undermined. Louisville & Nashville R. Co. v. McMullen, 1912, 5 Ala.App. 662, 59 So. 683, 684.

To a very limited extent, regulatory statutes may permit contracts for carriage at less than the published rates. But unless they do, the established legal

---

23. In Louisville & Nashville Railroad Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900, the carrier was permitted to collect the published tariff which was 50% higher than the rate it had charged the shipper, on the ground that such higher rate was fixed by law and no contract of the carrier could validly reduce the amount legally payable or release the shipper from liability to pay such higher rate. In Bernstein Bros. Pipe & Mach. Co. v. Denver & R. G. W. R. Co., 10 Cir., 193 F.2d 441, the court held that transportation charges are not a matter of private contract between the parties. In Davis v. Keystone Steel & Wire Co., 317 Ill. 278, 148 N.E. 47, at pages 51, 52, the court stated:

"* * * Congress for the correction of the abuses of extortion and favoritism before mentioned, made substantial changes in the relations existing between carriers engaged in interstate commerce and shippers, which have materially limited the freedom of contract between

them which originally existed. The terms of every contract of shipment, so far as the service to be rendered and the compensation to be received are concerned, are fixed by the schedules filed with and approved by the Interstate Commerce Commission. No agreement of the parties can modify these terms, though expressed in writing and actually performed. * * *

"* * * The approval of the schedule by the Commission is conclusive that the charge was reasonable. The liability of the appellant must be determined according to the terms of the contract which by the acts of the parties under the act of Congress was entered into. It was the contract of the parties though its terms were prescribed by Congress under its power to regulate commerce between the states, and in so doing to interfere with the right of private contract when the public interest in interstate transportation demands it."

See also Loveless Mfg. Co. v. Roadway Express, D.C., 104 F.Supp. 809.

rate applies. Section 22 of the Interstate Commerce Act permits such a contract to be made by a carrier with federal, state and municipal governments, or for charitable purposes, etc. However, this section has been held by the courts to confer no rights on the shipper to such lower rates since the provision is permissive only and the Interstate Commerce Commission may find that the lower rates agreed to are unreasonably discriminatory or unjust and subsequently disallow their application as prejudicial to interstate commerce. Nashville, Chattanooga & St. Louis Ry. v. State of Tennessee, 262 U.S. 318, 43 S.Ct. 583, 67 L.Ed. 999.

Where the United States contracts in the capacity of a shipper in interstate commerce, the courts have held that it is bound by the regulatory statutes in the same manner as other shippers. In Atchison, Topeka & Santa Fe Ry. v. United States, 256 U.S. 205, 41 S.Ct. 456, 65 L.Ed. 891, reversing 55 Ct.Cl. 528, the carrier was allowed to recover on the *basis of the regularly published tariff* applicable to the shipments in question. The Government had contended that (1) the sovereign was not bound by general legislative restrictions such as those contained in the Interstate Commerce Act; and that (2) in any event transportation of Government property was specifically exempted from the restrictions of the Act as to rates by virtue of Section 22 thereof. The Court held that in the absence of a valid special arrangement for a lower rate under Section 22, the United States is presumed to have assented to and became obligated to pay, the published rate; that the duty of the carrier to the United States was merely that of serving it at rates no higher than those applied to individuals for like transportation, less any lawful land grant deductions, and that the United States could not do that which the law forbade the individual shipper from doing. In United States v. Seaboard Air Line Ry. Co., 4 Cir., 22 F.2d 113, 114, the Government's counterclaim against the railroad, filed eight years after the loss, was dismissed on the ground that the Government was bound by the limitation (on the time within which claims might be asserted) contained in the bill of lading which had reference to the same rules and conditions that govern commercial shipments, "for the rule is well settled that in the construction and interpretation of government contracts the same general rules apply as in the case of contracts between individuals." And in St. Louis Brownsville & Mexico Ry. v. United States, 268 U.S. 169, page 173, 45 S.Ct. 472, at page 473, 69 L.Ed. 899, the court said:

> " * * * In respect to furnishing transportation, a railroad ordinarily bears to the government the same relation that it does to a private person using its facilities."

In United States v. Interstate Commerce Commission, D.C.Cir., 198 F.2d 958, 966, the Court held that the United States, as a shipper in interstate commerce, is bound by the legally published rate in the same manner as a private shipper, and quoted with approval from Union Wire Rope Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 8 Cir., 66 F.2d 965, 966–967, certiorari denied, 290 U.S. 686, 54 S.Ct. 122, 78 L.Ed. 591, as follows:

> " 'A rate tariff is in essence a statement by the carrier to possible shippers that it will furnish certain services under certain conditions for a certain price. When a tariff has become legally promulgated, it is binding upon both the carrier and any shipper taking advantage of it, and its terms (in essence) become, in such respects, *the only contract between the two allowed by law.'* "
> [Italics supplied.]

In Southern Pacific Co. v. United States, 272 U.S. 445, 47 S.Ct. 123, 71 L.Ed. 343, the court indicated that in a contract for carriage or transportation, the existence of a regularly published tariff for the type of shipment contracted for, furnished the necessary basis for a contract implied in fact to pay such published rate on the part of any shipper, including the Government.

This case is particularly applicable here. In that case shipments were made by the carrier for the Government without any express provision in the contract as to the rates that would be charged. The shipments were made over a land-grant route of the carrier, however, and the applicable land-grant statutes required the carrier to ship Government property at rates not exceeding fifty percent of *those paid by private shippers for the same kind of service.* It appeared that no tariff was actually on file for such service to private shippers. The carrier billed the Government for the shipments on the basis of a *special* tariff which the carrier had on file but which it was not by law required to file, and the Government refused to pay on that basis. It was held that the carrier could not recover on the basis of the special tariff because, although it was on file with the Interstate Commerce Commission, the representatives of the War Department were not chargeable as a matter of law with knowledge of any tariff which was not required by law to be filed. At page 448, of 272 U.S., at page 124 of 47 S.Ct. the Court stated:

"The ordinary consequences that attend the filing of a schedule of rates with the Interstate Commerce Commission as demanded or permitted by statute (cf. Texas & Pacific Ry. v. Mugg, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011; Chicago & Alton R. R. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033), cannot be invoked by the carrier merely because it lodged a special tariff with the commission without statutory authorization (Illinois Central R. R. Co. v. United States, 58 Ct.Cl. 182)."

The above mentioned ordinary consequences attending the filing of a schedule of rates as demanded or permitted by statute have been held to be (1) that the shipper and carrier are both conclusively presumed to know the legally published rates, and that such rates become a part of the contract of carriage as fully as if expressly set forth in the contract, and (2) such rates must be paid by the ship-per regardless of his ignorance of such rates or his express contract for lower rates.

That these consequences are applicable to the Government in its capacity as a shipper contracting with a private carrier, is further supported in United States v. Kansas City Southern Ry. Co., supra. That case also serves to emphasize the rule that where a legally published rate exists, the parties, including the Government, to a contract of carriage to which that rate applies, are bound by such rate regardless of the terms of their contract for a different rate or the demonstrable unreasonableness of the rate. In that case the United States sued the carrier to recover an alleged overcharge on shipments of grain, measured by the difference between the reasonable value of the carrier's service and the rate charged. The carrier's charges were made on the basis of duly published tariffs. The District Court (W.D.Mo.) stated that the common law actions to recover the excess of a freight charge over the duly published rate of a carrier to recover the difference between the amount of a reasonable charge and an exhorbitant unpublished charge, have not been affected by the Interstate Commerce Act. The court then pointed out, 116 F.Supp. at page 487:

"* * * *but,* if the charges of an interstate carrier have been made in accordance with filed and published rates, as provided in the Interstate Commerce Act, supra, the common-law remedy for enforcement of such a right has been abrogated, and enforcement of a claim under such circumstances is dependent upon the injured party's first filing a timely complaint with the Interstate Commerce Commission and obtaining a finding by that body that the rate charged was unreasonable under the circumstances, and the amount such party was thereby overcharged. * * * In a common-law action for recovery of damages, or overcharge, as the consequence of a published rate exacted

by an interstate carrier, the only question between a shipper and the carrier is what is, or was, the legal published rate for the shipment, and not what the rate should have been * * *."

The Government's complaint was dismissed.

■ It seems clear that when the Government contracts with a carrier for interstate transportation, its freedom to contract is limited by the provisions of the Interstate Commerce Act and the published tariffs in the same manner as is the case with a private shipper. We can find no justification or rule for applying a different principle to intrastate shipments.

■ With respect to intrastate motor transportation contracts to be performed in a State which has enacted valid [24] regulatory laws concerning the use of its highways and the making of transportation contracts, we are of the opinion that the United States, when it enters into such a contract, is bound like any private shipper, by the provisions of such State law unless there is some constitutional or statutory impediment to State jurisdiction, or unless the subject

matter of the contract is so essentially federal in character as to preclude State control thereof, or the application of State law thereto.

■ Defendant urges that Part II, Motor Carrier Act of the Interstate Commerce Act in general, and Section 22 of Part I of that act in particular, supersede Kentucky law with respect to intrastate motor transportation contracts entered into with the federal government. We do not agree. Section 22 permitting so-called discriminatory rate contracts between carriers and certain shippers (including the federal government) does apply to motor carrier contracts *which come within the scope* of the Federal Motor Carrier Act, but Congress specifically provided therein that such Act was itself not applicable to exclusively intrastate motor carrier transportation. Section 202(b) of that Act, 49 U.S.C.A. § 302, provides as follows:

"(b) Nothing in this chapter shall be construed to affect the powers of taxation of the several States or to authorize a motor carrier to do an intrastate business on the highways of any State, *or to interfere with the exclusive exercise by*

24. Under Kentucky law, parties to a contract of carriage are bound by the regularly published tariff on intrastate shipments in the same manner as are interstate carriers under the Interstate Commerce Act. Tobacco By-Products & Chemical Corp. v. Western D. F. T. G. Ass'n, 280 Ky. 469, 133 S.W.2d 723, holds that Section 214 of the Kentucky Constitution prohibits preferential contracts or arrangements by railroads with shippers for the transportation of freight or the conduct of any business as a common carrier and that Section 817 of the Kentucky Statutes makes such a carrier guilty of unjust discrimination. The Act of the General Assembly of Kentucky, approved March 17, 1932, Chap. 104, Act of 1932, p. 514 et seq., regulating transportation for hire of property by motor vehicles on the public highways of Kentucky, was held constitutional. Baker v. Glenn, D.C., 2 F.Supp. 880. Article 3, § 5, of that act prohibited any contract carrier to give any undue or unreasonable advantage or preference to its shippers as compared with patrons of

any common carrier, and required contract carriers to file with the Commission a statement of all its charges. The Act of March 11, 1942, Chap. 185, repealing the 1932 act, is almost identical.

In Hodge Drive-It-Yourself Co. v. Cincinnati, 284 U.S. 335, 52 S.Ct. 144, 76 L. Ed. 323, the Court held that the several States have the power, for the safety of the public, to regulate the use of their public highways, including their use as a place for the carrying on of private business. In Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288, the Court held that the States may properly regulate the rates of contract carriers by motor vehicle to prevent undue discrimination with respect to common carriers, and in general to foster a fair distribution of traffic as between the highways and the railroads so that all necessary facilities may be maintained and the public not inconvenienced by inordinate uses of the highways for purposes of gain. See also Sproles v. Binford, 286 U. S. 374, 52 S.Ct. 581, 76 L.Ed. 1167.

*each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof."* [Italics supplied.]

See Tucker v. Casualty Reciprocal Exchange, D.C., 40 F.Supp. 383.

■ Finally, the subject matter of the contract in suit is essentially local in character and concerns itself with matters over which the State should properly exercise exclusive jurisdiction. There would accordingly appear to be no impediment to this court's application of Kentucky law under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, even as that rule has been limited and defined in subsequent decisions.[25]

While we have not found a case in which a carrier was seeking to recover from the United States the difference between a regularly approved and published *intrastate* rate and the lower rate specified in the contract, we do not think this is important in view of the authorities hereinbefore cited. However, plaintiff has cited a case involving a contract between the United States and a state gas and electric company, in which a Federal District Court refused to require the utilities company to carry out its contract with the United States where the rate specified therein was less than the regularly published rate under applicable state law, and denied the Government's request for an injunction against the company's cessation of service under the contract unless the Government paid the higher published rate.

In United States v. Oklahoma Gas & Electric Co., 8 Cir., 297 F. 575, the federal government had entered into a contract with the local gas and electric company, whereby the company agreed to furnish the electric current needed at Fort Reno Remount Depot at certain specified rates, per kilowatt hour, for a period of one year, with the option in the Government to extend the contract from year to year. During the life of the contract the company notified the Government that it would no longer comply with the service requirements of the contract unless the Government paid for the service on the basis of a schedule of rates which were on file with and approved by the Corporation Commission of the state (Oklahoma), and which were higher than those rates specified in the contract under which the parties had been operating. In denying the Government's requests for the injunction, against discontinuance of service and the higher rate, the court pointed out that at the time the contract was entered into there existed under valid Oklahoma law a body known as the Corporation Commission, vested with general regulatory and supervisory power over all public utilities and having the authority to fix and establish rates. The company with which the Government was contracting was a public utility within the meaning of the Oklahoma statute. On appeal, the only question presented and argued was whether the lower rates specified in the contract should stand as against the order of the Oklahoma State Corporation Commission which had authorized and approved higher rates. The court held that the lower rates actually contracted for could not legally prevail under the contract; that the State was not powerless, in the exercise of its police power, to regulate the rates charged by a public utility in its business of supplying the public with electricity; that the exercise of such police power by the state did not impair the obligation of contract, nor take property without due process of law; that since the Commission existed with power under the State statute to fix rates in this field at the time the contract was entered into, the approved statutory rates in effect became a part of the contract, Walker v. Whitehead, 16 Wall. 314, 83 U.S. 314, 21 L.Ed. 357, as did the statute itself as though "it had been copied therein at length;"

**25.** Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; United States v. Standard Oil Co., 332 ■ U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067; See, 53 Columbia Law Review 991.

that a public utilities commission of a state cannot by contract of the parties be prevented either from increasing or decreasing such rates.

The United States argued in the Oklahoma case, supra, that a different rule should apply when the federal government is a party to the contract, citing Van Brocklin & Another v. State of Tennessee & Others, 117 U.S. 151, 6 S.Ct. 670, 29 L.Ed. 845. The District Court rejected this argument, pointing out that in the Van Brocklin case, the State of Tennessee had attempted to *tax land* of the United States which, by the federal Constitution, was exempt from state taxation, whereas in the rate case before it—

" * * * the government was contracting with one of its citizens to do a very common and ordinary thing not in any way relating to or involving its existence, viz, furnish electricity for lighting and motor power at Ft. Reno Remount Depot. We see no reason why as to a contract of this nature the government should occupy any different position than if the same had been made between two of its citizens." [297 F. 579.]

State regulation of such public utilities as gas and light companies is in general similar, insofar as this case is concerned, to the State's regulation of carriers and involves the same limitations on the parties' freedom of contract, particularly with regard to the matter of lower and higher rates, than those approved and provided for by statute and valid regulations.

In our opinion there is no material difference between the Government's position in the instant contract in relation to the binding effect of a state regulatory statute, from that in the above Oklahoma case. It is true, that in the Oklahoma case the utility company

was not suing the federal government, under the Tucker Act, to collect the difference between the contract rate and the higher rate contained in the legally published tariff. However, the District Court's refusal to enjoin the discontinuance of service and its refusal to require the company to carry out the terms of its contract with the Government at the lower rates specified therein, would have been a meaningless gesture if the company could not thereafter collect the published tariff by which the court clearly held the Government as a customer and contractor was bound. We see no difference in principle between that case and this one.

It would seem unthinkable, in our opinion, that the federal government which is responsible for the enactment and enforcement of such regulatory statutes as the Interstate Commerce Act and the Motor Carrier Act, among others, and which endorses and encourages similar regulatory acts on the part of the states in the exercise of the states' police powers in the same field, should not be bound by the same statutory limitations on its rights of contract as other shippers and users when it acts by contract in its nonsovereign capacity, as it did here, as a shipper in intrastate commerce. In St. Louis B. & M. Ry. v. United States, 268 U.S. 169, 173, 45 S.Ct. 472, 473, 69 L.Ed. 472, the Court stated:

"In respect to furnishing transportation, a railroad ordinarily bears to the government the same relation that it does to a private person using its facilities. * * "

Unless it is equally true that the Government as a shipper ordinarily bears to the railroad or motor carrier the same relation that a private person does,[26] then the Court's statement is almost meaningless and the Government as a contractor can completely undermine a State's regulatory system in the fields of trans-

26. Defendant argues that under a contract of carriage, the carrier is obligated to the Government in the same manner as it would be to a private shipper, but that the converse is not true.

portation, communication, and public utilities, since today, more than ever before, the Government is in many areas of the country the heaviest user of these state controlled and regulated facilities.

In the case before us, plaintiff, as a contract motor carrier, secured the necessary permission from the Commonwealth of Kentucky to do business in that state with the knowledge and approval of the Federal Government.[27] In attempting to arrive at the proper charges under the defective and invalid Quotation 29, *both* parties referred to the regularly published Kentucky intrastate tariff schedules. The Comptroller General used it, but misapplied it. Under the regulatory laws of Kentucky the collection by the carrier of the applicable and legally approved published tariff rates is not a matter of right but rather an obligation imposed by law as a part of the contract, and the rate so published is established by law in the same way in which a rate is established for interstate commerce under the Interstate Commerce Act.

Under all the circumstances of this case we are of the opinion that there was an express contract for transportation services over Kentucky highways between points solely within the state, as evidenced by the bills of lading and the actions of the parties. We think it is clear that neither party intended to violate Kentucky law in the making or performance of the contract; that both parties understood and intended that freight rates lawful under approved tariffs and Kentucky statutes should apply, and that the parties' use of Quotation 29, which had not been filed with or approved by the Kentucky Regulatory Commission (Kentucky Department of Motor Transportation) was due to the parties mutual ignorance of the positive requirements of Kentucky law. It is

clear that under Kentucky law, as under Federal law, ignorance of the published rate will not relieve either the carrier from collecting nor the shipper from paying, the lawful approved published rate. Under all the facts and circumstances of this case it is our opinion that Kentucky law is applicable to this contract between the carrier and the Government, and under that law and Kentucky Intrastate Motor Tariff No. 7–A, the carrier is entitled to recover on the basis of the regularly published rates, as established by that law, applicable to the shipments in question, as shown in the original and amended petitions.

Finally, defendant urges that plaintiff is estopped to claim rates higher than those which may be computed upon a strict application of and under Quotation 29, because the Government, as a shipper, was entitled to assume that the carrier had complied with Kentucky law in quoting the rates. It also points out that it was totally ignorant of Kentucky requirements as to the Kentucky approved and published rates, and that if it had known what the legal motor carrier rates were it might have decided to ship by rail. What its cost would have been if it had shipped by railroad, including hauling and loading, we do not know. But we think this is immaterial. It did not attempt to ship by rail.

Ordinary principles of estoppel do not apply to a carrier's right to collect the approved published tariff rate even in cases where the carrier has knowingly quoted an illegally low rate and the shipper, in this case through an authorized contracting officer, has innocently relied on such quotation, without inquiry or investigation, to its later detriment. In Louisville & Nashville Railroad Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900, the Court held that no act or omission

27. In Tucker v. Casualty Reciprocal Exchange, D.C., 40 F.Supp. 383, the court held that if a carrier desires to carry on interstate transportation, whether in connection with its interstate transportation or as exclusively intrastate transportation, the carrier must, under express provisions of Section 202(b) of the Motor Carrier Act, comply with the valid regulations of the state commissions.

of a carrier, except the statute of limitations, can estop or preclude it from enforcing payment of the full amount legally due by the shipper. In Baldwin v. Scott Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed. 1409, the court said:

" * * * equitable considerations may not serve to justify failure of a carrier to collect, or retention by shipper of, any part of lawful tariff charges."

In Steele v. General Mills, 329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402, the carrier was allowed to recover the difference between the published tariff, legal under Texas law, and the lower rate contained in the contract. The Court held that insofar as the contract called for an illegal rate, it was void and that the carrier was not estopped to rely on the State Commission's tariff, in order to recover on the basis of the published tariff. The Court held that the duty to pay the legal rate was not a matter of private obligation between shipper and carrier but was a duty of a public nature.

In Tobacco By-Products & Chemical Corp. v. Western D. F. T. G. Ass'n, 1939, 280 Ky. 469, 133 S.W.2d 723, the State appellate court reversed a holding of the lower court which had denied the carrier the right to recover on the ground of estoppel. The appellate court noted that Section 214 of the Kentucky Constitution prohibited preferential contracts by railroads and that under Section 817 of the Kentucky Statutes a common carrier giving a preferential rate was guilty of unjust discrimination. The court then held that a contract for less than the published tariff was contrary to public policy and illegal, and that the shipper's knowledge of the fact that he was obtaining a preference was immaterial, since both the carrier and the shipper are charged with knowledge of Kentucky law and the prevailing freight rates on file with the Kentucky Railroad Commission. See also Chicago & Alton R. R. Co. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033.

In Union Transfer Co. v. Renstrom, 1949, 151 Neb. 326, 37 N.W.2d 383, involving a contract for carriage by motor vehicle, the court held that ignorance of the shipper of the rates required by law cannot estop or prevent the carrier from collecting the legal rates. The court held that the reason for the rule is that the rights and duties of the carrier and shipper prescribed by the Federal Motor Carrier Act, the Interstate Commerce Act, and similar state enactments, are for the good of the public, to protect the public against secret rebates and discriminations, rather than for the enrichment of either the carrier or shipper at the expense of others, and that any direct or indirect evasion of such rights and duties by either is expressly prohibited by the regulatory acts. See also Davis v. Keystone Steel & Wire Co., 317 Ill. 278, 148 N.E. 47; Loveless Mfg. Co. v. Roadway Exp., D.C., 104 F.Supp. 809; Bernstein Bros. Pipe & Mach. Co. v. Denver & R. G. W. R. Co., 10 Cir., 193 F.2d 441.

The fact that under Kentucky law the reduced rates contained in Quotation 29 might have been approved, if proper application had been made, by Kentucky regulatory authorities under Kentucky law, does not aid the Government's position since such reduced rates were not in fact approved and without such approval the legally published tariff for this type of shipment became a part of the contract, binding on both carrier and shipper. We do not see how such rate (Quotation No. 29) could have been approved in face of the approved published tariff and the statute.

Plaintiff is entitled to recover on the basis of the applicable Kentucky Intrastate Motor Tariff No. 7-A, at the rate of 204 cents per hundred pounds on all shipments to Ft. Knox, and the rate of 266 cents per hundred pounds on all shipments to Morganfield.

Entry of judgment will be suspended pending a determination by the General Accounting Office of the precise sums due plaintiff under its original and amended

petitions, in accordance with this opinion.

Defendant's counterclaim for alleged overpayments of amounts alleged to be due it on shipments covered by bills of lading, listed in the original and amended petitions and based on defendant's interpretation of Quotation 29, is dismissed. Decision on the correct interpretation of Quotation 29 and its application to Kentucky tariff No. 7–A, is rendered unnecessary, in view of our decision that plaintiff is entitled to judgment on the basis of the applicable motor common carrier tariff rates contained in Central and Southern Tariff No. 7–A.

It is so ordered.

JONES, Chief Judge, concurs.

WHITAKER, Judge (concurring).

I think the defendant is liable for the rates fixed by the Kentucky law and regulations, and that we have jurisdiction to render judgment accordingly.

The contracting officer for the Department of the Army had authority to enter into a contract for the carriage of this ammunition, and at rates fixed by State law. Indeed, the extent of his authority in agreeing on rates for the transportation was to pay the rates fixed by State law, no more and no less, for it cannot be presumed that he was authorized to violate the law, Federal or State. Nor was the carrier empowered to enter into a contract to carry the goods at a lesser rate, without consent of the State.

The contract actually entered into was unauthorized; it was entered into in ignorance of the State law and not with the purpose of disregarding it. We must, therefore, impute an intention to the parties to enter into the only contract for rates they were authorized to enter into.

Whether this be denominated a contract implied in fact or in law, it is one upon which the United States can be held liable under the Tucker Act. There is nothing in that Act that prohibits it, and in no case involving facts similar to those of this case do we find such a prohibition.

The cases cited in the majority opinion deal with unauthorized contracts or cases where it is sought to spell out a contract from a tortious act, or where the facts negative an intention to enter into the contract sought to be enforced. This case falls into no one of these classes. In all the cases in which the Supreme Court has said that we have no jurisdiction to enter a judgment on a contract implied in law, there was either a negation of the contract asserted or lack of authority or a tort.

Here we are presented with a different problem: the question of our authority to set aside an unauthorized, indeed, an illegal, contract and to enforce the only contract which the law authorized. This, I think, we have the power to do.

Certainly we have no less power to do this than we have to set aside a contract for mutual mistake of fact, and to enforce the contract which we find the parties would have made had they known the facts. Our authority to do this is well recognized. Sutcliffe Storage & Warehouse Co., Inc. v. United States, 112 F.Supp. 590, 125 Ct.Cl. 297, 304, and cases there cited; Harrison Engineering & Construction Corp. v. United States, 68 F.Supp. 350, 107 Ct.Cl. 205; Peter Kiewit Sons' Co., v. United States, 74 F.Supp. 165, 109 Ct.Cl. 517; Poirier & McLane Corp. v. United States, Ct.Cl., 120 F.Supp. 209.

We have held that it is an implied condition of contracts that "neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." George A. Fuller Co. v. United States, 69 F.Supp 409, 411, 108 Ct.Cl. 70, 94.

The Supreme Court has held that there is an implied contract to keep leased premises in repair, although there is no such covenant in the lease. United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65. It held in Standard Oil Co. of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, that there was an implied contract to pay interest on War Risk Insurance policies, where the policies did not expressly so provide. Many other cases of enforcement of implied contracts might be cited in which the law imputes the contract, not the language or the acts of the parties.

In this case we must set aside the contract entered into because it was unlawful; then, having no express contract before us, we must imply that the parties would have entered into a lawful contract had they known what the law was, and render judgment on that contract.

For the reasons stated, I concur.

MADDEN, Judge (dissenting).

The court's decision enforces against the United States a claim founded upon a statute of the State of Kentucky. I think the United States has not consented to be sued upon such a claim. I agree with the court that the contract of carriage was subject to Kentucky law, and that the rates agreed to in the contract were illegal under Kentucky law. If the carrier had become aware of the illegality before it performed the carriage, it could have refused to perform, and the United States could not have successfully sued it for breach of contract. United States v. Oklahoma Gas & Electric Co., 8 Cir., 297 F. 575. In a sense, the United States was under a legal duty to pay the rates prescribed by Kentucky law, but it was, I think, a duty of imperfect obligation because the United States has not consented to be sued for its violation. It was of the same nature as all claims against the Government were before the establishment of this court.