**READING COMPANY**

v.

**The UNITED STATES.**

No. 98–52.

United States Court of Claims.

Nov. 30, 1954.

William P. McClure, Washington, D. C., for plaintiff. John E. McClure, Washington, D. C., W. I. Woodcock, Jr., and A. W. Hesse, Jr., Philadelphia, Pa., were on the briefs.

John R. Franklin, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff brings this suit to recover $7,865.89 deducted by the defendant from bills due plaintiff. The General Accounting Office made these deductions as the result of its ruling that plaintiff, as a railway carrier, had applied incorrect tariff rates on certain shipments of Government gasoline in drums and cans from points in Texas to Marcus Hook, Pennsylvania, in 1943. Defendant has filed two counterclaims in the total amount of $1,905.40, representing further alleged overpayments of freight charges on the shipments in question.

In 1943, the original bills for payment for these shipments were rendered to defendant based on a rate of $.82 per cwt., as published in the Southwestern Lines' Freight Tariff 133–F, Agent J. R. Peel's I. C. C. No. 3457 (hereinafter referred to as Tariff 133–F), reduced to a rate of $.66 per cwt. by application of Petroleum Reduction Tariff P–1, Agent J. R. Peel's I. C. C. No. 3437 (hereinafter discussed and referred to as the Tariff of Reduced Rates). No land-grant reductions were applied on freight bills rendered and these bills were paid by defendant.

Thereafter, in 1947, plaintiff, believing that it had incorrectly used the Tariff P–1 rate on shipments of gasoline in drums and cans, rendered supplemental bills in the amount of $3,059.70 covering these same shipments. This sum represents the difference between the rate of $.66 per cwt., as originally paid, and the $.82 rate provided by Tariff 133–F reduced by only the land-grant reduction, plaintiff contending that it was

in error in 1943, in applying the P-1 Tariff of Reduced Rates. The General Accounting Office refused payment of all but one of these supplemental bills and made claims on plaintiff for a refund of alleged overpayments of $7,865.89 on the ground the land-grant reduction should have been applied to the $.66 per cwt. figure contained in the original 1943 bills. Upon plaintiff's refusal to refund this sum, it was subsequently deducted and withheld from current bills due plaintiff.

The parties have stipulated that $7,-865.89 is the amount due plaintiff if its position that the proper tariff rate was $.82 reduced to $.68 for land-grant reductions, is sustained. This figure of $7,865.89 so agreed to represents the difference between the $.66·received by plaintiff on the bills in question and $.55 (approximate) which is the Tariff of Reduced Rates figure ($.66) minus the land-grant reduction which defendant alleges should have been applied in the 1943 bills.

Plaintiff, while conceding that a land-grant reduction is applicable, takes the position that the proper rate for the shipments of gasoline in drums and cans is $.82 as provided in Tariff 133-F reduced to $.68385 by the land-grant reduction rate. Thus, plaintiff alleges the General Accounting Office acted incorrectly and underpaid it when, in 1947, it applied the land-grant reduction to the erroneous $.66 rate. The plaintiff agrees to limit its recovery to $7,865.89 in addition to the amount finally paid to it by defendant.

Defendant's position is that the lower figure of $.66 reduced by the land-grant reduction is the correct tariff rate for the shipments in question.

The basic tariff in effect at the time the Tariff of Reduced Rates No. P-1 was issued was Southwestern Lines' Tariff No. 133-E. Tariff 133-F, issued November 25, 1941, canceled Tariff 133-E, became effective January 4, 1942, and was in effect at the time of these shipments. Tariff 133-F is the base tariff for our purpose here. It, like 133-E,

provided for a basic freight rate of $.82 per cwt. on the shipments of *gasoline in either tank cars or drums* over the routes involved (finding 17). Item 5 of this tariff, under the heading "Application of Tariff of Reduced Rates No. P-1," reads as follows:

"Except as otherwise provided under Exception shown below, rates published in this Tariff, as amended, on Petroleum Products, as described in Tariff of Reduced Rates referred to in this item, are hereby reduced as provided in Tariff of Reduced Rates No. P-1, Agents J. R. Peel's I. C. C. No. 3437, L. E. Kipp's I. C. C. No. A-3352. (Fourth Section Order 14373 of September 9, 1941).

"Exception—Rule 4 of Tariff of Reduced Rates No. P-1, J. R. Peel's I. C. C. No. 3437, L. E. Kipp's I. C. C. No. A-3352, will not apply in connection with rates to Brunswick, Me., on traffic destined to points in the States of Maine, nor to Charlestown, N. H., on traffic destined to Springfield, Vt., nor to Barre, Vt., on traffic destined to points on the Barre and Chelsea RRCo."

The Tariff of Reduced Rates was issued in the fall of 1941, effective September 15, 1941, as part of a program on the part of the Government to relieve a serious shortage of petroleum products in the Eastern States, which shortage existed because a number of tankers engaged in transporting petroleum from the Texas Gulf Ports to the North Atlantic Ports had been transferred by the President to the British Government to replace British tankers lost·by enemy action. The oil companies were requested by the Petroleum Coordinator for National Defense to utilize all available railway tank cars for the purpose of transporting petroleum into the Eastern States. At the same time H. A. Gilbert, Chief of Transportation in the Office of the Petroleum Coordinator, informed representatives of the railroads that it would be necessary for them to transport substantial quantities of petroleum prod-

ucts into the shortage areas, and through Gilbert the railroads were requested to provide reduced rates for these shipments. Early in September of that year the railroads filed with the Interstate Commerce Commission applications for authority to establish reduced rates for shipments in the shortage areas, and on September 9, 1941, the Interstate Commerce Commission issued orders granting this authority. These were followed on September 11, by the issuance of the Tariff of Reduced Rates. This tariff was designated as follows:

"Tariff of Reduced Rates
No. P-1
On
Petroleum Products, Carloads
In Tank Cars"

The application section of the tariff read as follows:

"Application
(See Note 1)
Class and Commodity Rates on petroleum products, viz:
Benzine;
Fuel Oil, residual or distillate, not suitable for illuminating purposes;
Gas Oil;
Gasoline, Casinghead;
Gasoline, Natural;
Gasoline, not otherwise indexed by name in the governing Classification;
Gasolines, Blended, consisting of motor fuels containing 50 percent or more of gasoline;
Kerosene;
Naphtha;
Naphtha Distillate;
Refined Oil, illuminating or burning;
*Carloads, in tank cars;* * * *"
(Italics supplied).

Thereafter various supplements to this tariff were issued, but their content insofar as they are pertinent here remained the same through the first six supplements. Supplement 7, however, while containing the above designation on its title page, "Petroleum Products, Carloads in Tank Cars," added after the phrase "in Tank Cars," the following:

(Except as otherwise provided in Rules 6 and 7 herein.) Rules 6 and 7 provided that rates in the tariff which were to apply to *certain specified petroleum products* when transported in tank cars were likewise to apply when those same products were shipped in drums (Rule 6), or in containers in or on container cars (Rule 7). The products designated in these two rules were ones that appeared in the application section of the tariff. *Gasoline was not included in the products listed in Rules 6 and 7.*

It is plaintiff's contention that in determining the applicability of the Tariff of Reduced Rates, it is the language of that tariff which must be applied, and that when this is done it is clear that the tariff and reduced rate were intended to apply to shipments of gasoline only when transported in tank cars. Plaintiff further asserts that the events surrounding the issuance of the tariff together with the Interstate Commerce Commission orders and the subsequent amendment of the tariff (Supplement 7) resolve any ambiguity that might exist in favor of this construction. On the record we agree with plaintiff's position.

Defendant's principal contention is that in determining to which shipments the rate in the Tariff of Reduced Rates No. P-1 applies one must look first to Item No. 5 of Tariff 133-F. In support of this contention defendant asserts that if it had been the intention of the carriers publishing Tariff 133-F to restrict the application of the reduced rates provided in the Tariff of Reduced Rates No. P-1 so as not to apply to gasoline "in packages," such intention could easily have been accomplished by the use of appropriate language in Item No. 5. Defendant also urges that the use of the phrase "in tank cars" as it appears in the Tariff of Reduced Rates is not part of the commodity description but is a designation of a shipping form, and that the reference to the Tariff of Reduced

Rates is solely for the purpose of commodity description, with the packaging requirements to be governed by the base tariff, Tariff 133-F, which covered gasoline whether shipped in tank cars or other containers.

Defendant also contends that at the very least the omission of any such restriction from Item No. 5 creates an ambiguity in the application of the reduced rates which ambiguity should be resolved against the plaintiff, as the carrier, and in favor of the defendant, as the shipper.

Finally, defendant resists recovery by plaintiff on the premise that plaintiff is now estopped from seeking the higher rate, having originally billed and accepted payment at the lower rate.

■ The issue presented is whether or not the Tariff of Reduced Rates applies to the shipment of gasoline in containers other than tank cars. We believe that it does not. Item No. 5 of Tariff 133-F provided for the application of a reduced rate "on Petroleum Products, as described in Tariff of Reduced Rates." Gasoline in drums or cans was not so described and we hold that the defendant is not entitled to the lower rate on the shipments in question.

The events surrounding the issuance of the tariff (finding 12), which we find to be material here since those events were instigated by and participated in by the defendant, show quite clearly that the problem at hand was one of transporting petroleum products in large quantities, i. e. in tank cars, to the shortage areas. There is nothing present in either the negotiations which preceded the issuance of the Tariff of Reduced Rates, the Interstate Commerce Commission orders (finding 13), or the tariff itself, which supports the belief that gasoline other than in tank cars was to be covered. Both the title page of the tariff as originally issued in 1941 and the supplements to it contain throughout the phrase "in tank cars." Such a limiting phrase appears as well in the application section of the tariff. This construction is supported by the issuance of Supplement 7 and the Interstate Commerce Commission order which preceded. it when it was specifically amended to include certain petroleum products, other than gasoline, when transported in drums or other containers (finding 16). If defendant's position is correct then this amendment was a useless act since the products mentioned in the amendment were already listed in the application section of the tariff as issued in 1941 and in the supplements which followed (findings 15 and 16). The need for such an amendment is likewise contrary to defendant's assertion that the phrase "in tank cars," as it appears in the tariff, is not part of the commodity description or that Tariff 133-F must be referred to in determining the packaging requirements.

In support of these latter assertions defendant relies on several decisions by the Interstate Commerce Commission. Those decisions, however, appear to rule that resort is made to the base tariff only where the exception, such as the Tariff of Reduced Rates, is incomplete in its description. We have not found this to be the case here.

■■ Nor is plaintiff barred on the theory of estoppel. Because of the public interest involved this doctrine does not ordinarily apply as against a carrier's right to collect the lawful rate. Hughes Transportation, Inc. v. United States, 121 F.Supp. 212, 128 Ct.Cl. 221, 258-259, and cases there cited.

■■ On the facts of this case the scales are not so evenly balanced that defendant's position can be sustained by applying the general rule that any ambiguity in a tariff is to be resolved against the carrier and in favor of the shipper. Nor does the situation here call for the application of that rule even if this were so. Here, unlike the cases which have applied that rule, the shipper (defendant) was much more than a party to the negotiations which led to the issuance of the Tariff of Reduced Rates. That tariff was instituted at its request as a result of its decision that some arrangement should be made to relieve a petroleum shortage in the Eastern States.

Judgment is entered for plaintiff in the sum of $7,865.89, and defendant's counterclaims are dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

**VIRGINIA ELECTRIC AND POWER COMPANY, Successor to Virginia Public Service Company**

**v.**

**The UNITED STATES.**

**No. 37-52.**

United States Court of Claims.
Nov. 30, 1954.

H. Brice Graves, Ann Arbor, Mich., for plaintiff. T. Justin Moore, and Hunton, Williams, Gay, Moore & Powell, Richmond, Va., were on the brief.

John A. Rees, Washington, D. C., with whom was Asst. Atty. Gen. H. Brian Holland, for defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is a suit for additional interest which, the plaintiff contends, the United States should have paid in connection with the refund to it of excess profits taxes paid by the plaintiff's predecessor. The Virginia Public Service Company paid the taxes in question for the year 1941. In 1944 that company was merged into the plaintiff. The refund, the interest on which is here involved, was made after 1944, and was made to the plaintiff, which had succeeded to all the rights of the Virginia Public Service Company. Hereinafter the words "plaintiff" and "taxpayer" will be used indiscriminately in referring to either the plaintiff or its predecessor.